450 So.2d 611 (1984)
STATE of Louisiana
v.
Larry GABRIEL, James Turner and Freddie Williams.
No. 83-KA-0749.
Supreme Court of Louisiana.
April 2, 1984.
*612 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., William Campbell, Tim McElroy, Linda Bizzaro, Clifford R. Strider, Asst. Dist. Attys., for plaintiff-appellee.
Robert Glass, John Reed, Glass & Reed, New Orleans, for Larry Gabriel.
Mark McTernan, New Orleans, for James Turner.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for Freddie Williams.
CALOGERO, Justice.
Defendants Larry Gabriel, James Turner and Freddie Williams pleaded not guilty to two counts of armed robbery and one count of attempted first-degree murder, in violation of La.R.S. 14:64, R.S. 14:27 and 14:30. A twelve person jury found each defendant guilty of two counts of armed robbery, but acquitted all three on the attempted murder charge.[1] Subsequently, Gabriel was adjudged a third felony offender and sentenced to ninety-nine (99) years on each count, concurrent, with credit for time served; Williams was adjudged a fourth felony offender and sentenced to ninety-nine (99) years on each count, concurrent, with credit for time served; and Turner was sentenced to fifty (50) years on each count, concurrent, with credit for time served. They now appeal, Gabriel raising three assignments of error, Turner raising sixteen assignments and Williams adopting the assignments and briefs of his co-appellants.
We find two of defendant Gabriel's assignments of error meritorious, reverse his conviction and remand his case to the district court for new trial. We treat the two meritorious assignments in the main text of this opinion. Gabriel's third assignment of error and all of the assignments of defendants Turner and Williams are governed by clearly established principles of law and will be discussed in an appendix to this opinion which will not be published in the Southern Reporter.
The following was adduced at trial. At about 12:30 p.m. on the afternoon of May 14, 1981, two masked men entered the Pelican Homestead at 5301 Elysian Fields Avenue in New Orleans.[2] At least one of the men was armed with a hand gun.[3]
The men ordered everyone down on the floor and instructed a teller, Tamara Popp, to empty the cash drawers into a white plastic bag. Ms. Popp followed instructions, making sure that the plastic bag contained some of the specially marked bait money kept for such circumstances. While this was being done, one of the robbers demanded a set of keys from Andrew Patton. The customer complied and handed over his truck keys. Taking the keys and the bag containing the money, the robbers fled through the rear door of the building. Once outside they encountered Ewell Kilburn, a customer who had just pulled up to the drive-in window. Forcing Kilburn out of his car at gun point, the men got into his car and pulled out into traffic on Elysian Fields Avenue. Kilburn's car, a blue and white 1979 Oldsmobile Cutlass, ran well but its diesel engine smoked a lot.
At the same time, approximately 12:41 p.m., Officer Louis Adams of the New Orleans Police Department was on Elysian Fields near Filmore Avenue, proceeding in a lakebound direction. Adams, in uniform but driving an unmarked vehicle, noticed a *613 late model blue and white Oldsmobile pull out of Pelican Homestead's parking lot. His attention was drawn to the car because of the "large amount of black smoke com[ing] out of the exhaust." Officer Adams testified
Well, the car continued smoking, and it pulled up in front of me approximately two car lengths in front of me and it pulled over to my left.
I observed three black males in the car. Two black males were in the front seat, and one black male was in the back seat. And, they appeared to be laughing and kind of joking about something that was very humorous because the driver looked back at me when he pulled into my lane, and he was laughing. It kind of drew my curiosity why he came out of the parking lot and sped down Elysian Fields so fast.
As Adams followed behind the car, he radioed the police dispatcher and was advised of an armed robbery in progress at Filmore and Elysian Fields (i.e., the location of Pelican Homestead). Adams reported that he was following a car which had just left that location and requested backup assistance. At this point, the Oldsmobile began picking up speed.
As Adams followed, driving at times to within six feet of the vehicle he observed the driver lift a long-barrel pistol into the air and hand it to the man in the back seat. Taking the gun, the man in the back seat turned to face the officer, leaned out of the window and fired at Adams.
After an eight minute chase, the car turned into Rayne, a dead-end street near the London Avenue Canal and another shot (the fourth) rang out. Adams watched as the three jumped from the car, and fled into a nearby wooded area.[4]
After taking the keys from the Oldsmobile's ignition, Officer Adams followed the suspects and caught a glimpse of two of the men, moving together, holding "something white" between them. He lost sight of the men but continuing through the woods, Adams came across a ski mask and a bag of money (later confiscated by a crime scene detail). In the meantime, Officers Leroy DeFrisco and Walter Averett drove to the area in response to the armed robbery and "officer needs assistance" calls. DeFrisco and Averett spotted two black males on the street who were "sweating, and ... appeared to have been running." One of the men, later identified as James Turner, was carrying something white and kept looking back over his shoulder. The other man, Freddie Williams, took off "almost in a run" when he saw the policemen. DeFrisco left the car, and, armed with a shotgun, ordered Turner to halt; Williams was stopped by Officer Averett. Confronted by the armed policemen, Turner threw down the plastic bag and said "It doesn't belong to me."
Besides the bag which contained about $8,000, Turner was also found in possession of a stocking and a yellow Playtex rubber glove, left hand. From Williams, Officer Averett seized a set of keys. A more thorough search of Williams a short time later uncovered, stuffed into Williams' sock, a single yellow Playtex rubber glove, right hand, with the trigger finger cut out.
Not far away, an off-duty reserve police officer in civilian clothes, Mike Golden, also heard the calls and drove his unmarked van into position to cut off a possible escape route into the St. Bernard Project.
Shortly, Golden spotted a black male (later identified as Gabriel) running down the street allegedly in his direction. Golden testified that Gabriel would run until the sounds of police sirens neared the area; then he would slow down to a walk. As the sirens faded, Gabriel would begin running again. When Gabriel got to within *614 twenty feet of Golden's van, Golden placed Gabriel under arrest.
Following their arrests, Gabriel, Turner and Williams were transported back to Pelican Homestead where the three were placed in a line-up. Subsequently, Gabriel, Turner and Williams were charged with armed robbery of Tamara Popp (money from the homestead) and Ewell Kilburn (Oldsmobile) and the attempted first degree murder of Officer Adams.
At trial, the state was able to show that the money seized pursuant to the arrest of Williams and Turner contained some of the bait money taken during the robbery. Witnesses identified the recovered ski mask, plastic bag, gun, and various items of clothing, as similar to those used by the robbers.
At trial, Gabriel introduced an alibi defense. Neither Turner nor Williams produced any evidence and none of the defendants testified in their own behalf.
As will be discussed more fully hereinafter, the identification testimony presented by two state witnesses, Darlene Fredricks and Officer Louis Adams, was the strongest evidence to link Gabriel with either the two defendants, the escape vehicle, or the Pelican Homestead robbery.

Gabriel's Assignments of Error Nos. 1 and 2
The first assignment of error filed by defendant Gabriel, which we find to have merit, involves defense counsel's attempt to introduce two pages of the preliminary examination testimony of state witness Darlene Fredricks, at which preliminary examination she had failed to identify defendant Gabriel as one of the robbers. The second assignment of error of defendant Gabriel which we find meritorious involves the failure of the trial court to allow his defense counsel access to the relevant portions of an official police report of the incident, a report which allegedly recited that Officer Adams, the officer participating in the chase of the automobile from Pelican Homestead to the point of its abandonment had on the day of the robbery identified Gabriel as the driver of the car.
For the reasons which follow, we find these two assignments of error meritorious relative to the defendant Larry Gabriel.[8]
Defendant Gabriel was the only defendant of the three who put on a defense. That defense primarily was one of alibi wherein he denied being at the scene of the robbery and denied being the driver of the getaway car.
Unlike the evidence against Turner and Williams[9], there was no physical evidence linking Gabriel either with the other two defendants or with the Pelican Homestead robbery itself. Gabriel was arrested completely independently of Turner and Williams, at a location several blocks away from the scene of the Turner and Williams arrest, and away from the wooded area into which Officer Adams saw the occupants of the car flee.
The evidence the state presented against Gabriel consisted of the following:
(1) The reserve police officer who arrested Gabriel testified that Gabriel was alternately walking and running on St. Denis *615 Street in a direction away from the wooded area towards Paris Avenue, was sweating and had grass in his hair.[10] This testimony, however, was contradicted by that of an eyewitness resident of St. Denis St. The eye witness to the arrest testified for the defense that Gabriel was leisurely walking from the opposite direction (coming from Paris Avenue heading towards the wooded area) said hello in passing, to a man sitting on a porch.[11] Suddenly she saw a man in a white van (the reserve officer) stop, jump out and subdue Gabriel in such a forceful manner that the eye witnesses thought Gabriel himself was a victim of a robbery until such time as uniformed police officers arrived and took Gabriel away.
(2) There was evidence that the truck Gabriel drove for his job was found parked a block away from the robbery site. Gabriel's counsel, however, elicited testimony at trial that the truck had been stolen before the time of the robbery. A defense witness testified that Gabriel had stopped briefly around the noon hour the day of the robbery at a bar where neighborhood friends gather, and upon leaving had returned abruptly, stating that his company truck had been stolen. Another acquaintance had seen Gabriel shortly thereafter, walking in a direction consistent with his having been seen later on St. Denis Street heading towards the wooded area (not away from it as the arresting officer testified). Upon inquiry, Gabriel had told this acquaintance that his company truck had been stolen and that he was looking for it. With the testimony of these two witnesses, Gabriel's defense counsel sought to establish that the truck had been stolen before the Pelican Homestead robbery and that at the time of the robbery, Gabriel, on foot, was several miles away from the Homestead.
(3) Beyond the circumstances of Gabriel's arrest and the discovery of the truck, the evidence against Gabriel was identification testimony. Five witnesses gave such testimony, much of which centered on his having been arrested wearing light brown, khaki pants. One of the robbers of Pelican Homestead had worn light brown, khaki trousers.
Anita Poche could not identify Gabriel by face, but indicated in her testimony that Gabriel fit the general appearance of one of the robbers, and the khaki pants worn by one of the robbers was similar to those Gabriel was wearing when he was arrested.
Ewell Kilburn, owner of the Oldsmobile in which the three robbers attempted to escape, testified initially at trial that when the defendants were returned to Pelican Homestead he recognized the trio as those who had forced him out of his car. On cross examination, it was established however that Williams was the only one Kilburn was clearly able to identify since Williams was the one who had held the gun. Moreover, Kilburn admitted that he had not positively identified Gabriel the day of the robbery and he could not identify Gabriel (nor for that matter, the other defendants) the day of trial.
Another customer at Pelican Homestead, Eudell Bundy, identified Gabriel only to the point that Gabriel's khaki pants were similar to those worn by one of the robbers. However, Bundy also testified that the robber wore hightop shoes with cleats on the bottom. Gabriel's wife testified for the defense at trial that Gabriel did not own and had not owned hightop shoes with cleats.
Additional defense witnesses controverting the Pelican Homestead identifications included two residents of the area in which Turner and Williams were arrested. These two separately related seeing, before Turner and Williams were arrested, a third man, of description different from Gabriel's, run *616 away in a direction different from that in which Gabriel was proceeding at the time Golden arrested him.
The most persuasive identification testimony then was that of Darlene Fredricks[12] and Officer Louis Adams.
Darlene Fredricks, manager of Pelican Homestead at the time of the offense, only saw two of the robbers.[13] On direct examination at trial, Fredricks testified that the two she had identified the day of the robbery were Gabriel and Turner. At the preliminary examination attended only by Turner and Gabriel, however, she had been able to identify only Turner as one of the robbers, and had expressly stated that she could not identify Gabriel.
Both state and defense have the right to impeach the testimony and credibility of every witness sworn on behalf of the other side. La.R.S. 15:486; La.R.S. 15:493. Thus proof of a prior contradictory statement made at a preliminary hearing may be used to impeach a witness at trial. State v. Prestridge, 399 So.2d 564 at 574 (La.1981).
On cross examination at trial, Gabriel's defense counsel tried to undercut the reliability of Fredricks' identification by questioning Fredricks about her preliminary examination testimony, and then later by introducing into evidence that portion of the transcript of that proceeding wherein she was unable to identify Gabriel. In order to support the defense contention that Fredricks had not identified Gabriel the day of the incident but had identified Turner and Williams, it was critical for the jury not only to hear but also to understand that at the preliminary examination, with Gabriel present and Williams not present in the courtroom, Fredricks had identified only Turner. Counsel for the defendant repeatedly and variously confronted Fredricks with her prior inconsistent statement, but was unable to have Fredricks admit unequivocably from the stand to the jury that she had not identified Gabriel at the preliminary hearing.
When a witness fails distinctly to admit his or her prior inconsistent statement, the proof of that statement is admissible. La. R.S. 15:493; State v. Bonanno, 373 So.2d 1284 at 1291 (La.1979); State v. Rudolph, 332 So.2d 806 at 813 (La.1976). Unless the inconsistency is introduced and proven, some or all members of the jury may be misled by the witness into believing either that there was no inconsistency or that the inconsistency was simply a lawyer's manipulating the witness' testimony to his client's advantage.
Furthermore, defense counsel's attempt to highlight the inconsistencies in Fredricks' testimony for the jury was spotted with objections, interjections and interruptions by the district attorney, all of which taken together could well have led the jury to infer that the witness had not in fact testified contradictorily on the earlier occasion.
Additionally at the time that defense counsel sought to have the two pages of the transcribed preliminary examination testimony exhibited to the jury, the state objected that the defense was trying to admit the testimony in part, and was taking *617 the testimony out of context.[14] The state's objection hinted to the jury that perhaps Fredricks had not made an inconsistent statement or inconsistent identification and that the two pages that the defense sought to admit would in some way inaccurately reflect what she had indeed related at the preliminary hearing. When the court refused to admit the transcript, not only was the jury denied the benefit of that transcript, which would clearly have shown an inconsistency, but also the jury was again given the impression that perhaps there was no inconsistency and that the defense was unfairly taking out of context minor aspects of the witness' prior testimony.
The trial court's error in not admitting the transcript of the witness' earlier testimony would not necessarily constitute reversible error, however. In State v. Gomez, 365 So.2d 1313 at 1316 (La.1978), a prosecution for manslaughter, this Court found error in the trial court's failure to admit evidence of a witness' prior inconsistencies, but found no reversible error where "the jury was fully informed of the nature and content of this prior contradictory statement." In State v. Lewis, 354 So.2d 566 at 568 (La.1978), a prosecution for distribution of heroin, this Court found no reversible error where defendants sought to impeach a witness police officer but where "... the jury was fully informed ... of the officer's prior inconsistent testimony."
In each of these cases, a majority of this Court found the error harmless because the substance of the prior inconsistent statement was effectively placed before the jury in other ways (Gomez) and because the impeachment concerned an issue which was peripheral to the case (Lewis). Neither conclusion is warranted here.
In this case, insofar as defendant Gabriel is concerned, the trial court erroneously refused to admit the two pertinent pages of Fredricks' preliminary examination testimony, and thus prevented Gabriel's defense from establishing the inconsistency and the consequent unreliability of Fredricks' trial identification that Gabriel as one of the robbers of Pelican Homestead. We find that the jury was not presented a clear and concise picture of the full extent of Fredricks' contradictory identification testimony at the preliminary examination. The inconsistency of Fredricks' statement was disputed to the very end, with the state continuing to assert that the inconsistency was all a matter of a misinterpretation of the transcript. Secondly, the issue of the identification, or not, of Gabriel as one of the robbers, went to the heart of the case. All of the other evidence linking him either to the other defendants or to the robbery itself with the exception perhaps of Adams' testimony (see next discussion) was weak by comparison with the Fredricks' identification. The failure of the trial court to allow the defendant to present to the jury a copy of the transcript containing Fredricks' prior inconsistent statement notwithstanding the defendant's right to impeach witnesses against him (La.R.S. 15:486 and 493) was substantially prejudicial to Gabriel's case. La.C.Cr.P. art. 921.
The prejudicial effect of this single error in denying defense counsel's request that the contradictory portions of the Fredricks' testimony at the preliminary examination be presented to the jury before they deliberated, is compounded by the second trial error which relates to the testimony of Officer Adams.
Officer Adams' testimony against Gabriel was probably even more damaging to Gabriel than the testimony of Fredricks and of all of the other state witnesses combined. Whereas all of the other witnesses were unable to view the faces of the robbers because each was wearing a mask, Officer Adams, the off duty policeman who gave chase to the car exiting the homestead parking lot, testified unequivocally *618 that he got full face glimpses, with masks removed, of two of the robbers.
During direct examination, Officer Adams recounted for the jury the details of his chase and positively identified Williams as the gunman who fired at him from the car, and Gabriel, as the driver. Furthermore, Officer Adams testified that he had confronted the three defendants at police headquarters after their arrest and on his way to turn in his notes to reporting Officer Steinkamp. The fact of this inadvertent confrontation between Adams and the three defendants had not been made known before Adams' testimony at trial.[15]
Adams' headquarters confrontation's having previously gone unreported to either the state or the defense (until trial) prompted a plausible suspicion, according to the defendant, that Adams' identification testimony was less than fully credible. Gabriel's counsel examined Adams on this point and Adams testified that the official police report in this matter, which he claimed to have read prior to his testimony, noted that on the very day of the crime Adams had told Steinkamp that Gabriel was the escape vehicle driver. Adams stated that he had reviewed the official police report of the incident (prepared by Steinkamp) prior to his appearance in court and that the report

describes me saying that Larry Gabriel was driving the carwas the driver of the vehicle and he handed the gun to Mr. Williams who was the the back seat of the car who shot at me.
And, does it say that that information was given to the officers upon your confrontation with the three arrested individuals at the Major Offense Bureau?
No, sir, it does not.
Does it say in that report where it was that you got the ability to identify by name any of the three defendants as participating in any role in that chase?
Sir, I identified them by name just now. I had identified them by face.
Are you saying then that in this report the official report of the New Orleans Police Department there is the information recorded that on May 14th at the Detective Bureau you identified the driver and the person in the back seat by face?
That is correct. And, the detective put the face to the name. I didn't.
Following an objection and a conference at the bench, the judge ordered counsel and the witness into chambers. Defense counsel requested that the prosecutor review the police report to determine whether the officer was telling the truth about its contents. The prosecutor complied, reviewed the report and stated
The police report is written in such a way that Officer Adams' testimony is described by Steinkamp,'He pulled out and saw three people in the car.' He described Adams' actions in detail, and he said what each person did by name in his report.
Those names are in the record. Now, when he sayswhen he uses the wordshe says that Adams identified Williams as the manas the shooter in the back seat. And, Adams says that Gabriel was the driver. There is no mention of any identification procedure in the report, Your Honor.
*619 The prosecutor here seemed to be saying inferentially rather than expressly, after she alone had examined the report, that the police report supported Adams' testimony just previously given in court. In any event counsel for Gabriel then requested that the court inspect the police report to ascertain the validity of Adams' sworn testimony that the police report had Adams asserting on the day of the robbery that Gabriel was the driver of the escape vehicle. If the police report did not so verify Adams' assertion, the defense wanted to be allowed to use that portion of the police report concerning the information Adams reported to Officer Steinkamp to impeach Adams' testimony as to the identification of the people he chased in the car on May 14, 1981. It is worth noting that defense counsel was not asking to inspect the contents of the entire police report in this matter. Counsel only requested that he be allowed to establish in some way the fact that the police report did or did not contain the information to which Adams had testified. Counsel suggested that it might be sufficient to allow the witness to read the report and specify for the jury, if he could, the place where that information was contained. Further discussion led to the court's decision to review the report itself.
At no time was defense counsel permitted to inspect the police report. The requested inspection was conducted in camera by the trial judge. Gabriel's counsel asked:
For the record, is there anything in the report, Your Honor, that says that Officer Louis Adams told Detective Steinkamp that he identified Gabriel as the driver and Williams in the back seat of the car? I think at least I ought to get the record to cross examine this man on because on the witness stand he said that he had reviewed the reportSteinkamp's report, and that in this report was the information that he had identified these people and called them by name.
The prosecutor interjected:
Your Honor, the report is written as a narrative, and it reads as a narrative. It says that Officer Adams pulled out of a driveway, and it details the escapethe trail. And, it says that the subject Williams fired at the detectiveOfficer Adams. And, it says that Gabriel was the driver of the car and the direction in which they were driving. You can't write a report without naming people.[16]
The trial court inspected the report and, without giving reasons, refused to order the disclosure of the police report to or its use in any way by defense counsel. The defendant was thus unable to bring to the attention of the jury the fact that the police report did not contain the information that Officer Adams had sworn under oath was contained therein, a report which Officer Adams had testified that he had read in preparation for trial testimony that very morning. Counsel for Gabriel then moved to have a copy of the report sealed for review on appeal and all defendants moved for a mistrial. The motion was denied.
Back in open court, the cross-examination of Adams continued. Counsel moved for production of the report in order to enable defense to impeach the witness. The trial court denied the motion, to which error was assigned.
Our review of the police report, a copy of which was placed under seal, does not support Adams' assertion at trial that the report "describes me as saying that Larry Gabriel was driving.... and he handed the gun to Mr. Williams who was in the back seat ... who shot at me." The report, in fact, says nothing of the sort. It indicates that Adams was interviewed by Detectives Steinkamp, Davis and Pellegrin. There follows a narrative account of Adams' following the car from the homestead, the car *620 chase, the shootings, and later, the abandonment of the car and the flight of the suspects. Throughout the account, the men in the car are described as "three negro male occupants," and are not otherwise identified.
The police report does not support Officer Adams' trial testimony. Moreover the prosecutor's account of what the police report contains cannot be reconciled with the copy of the document which is before the Court. Adams' account of the incident did not name people. Nor does it say that Adams had reported to Officer Steinkamp that he recognized two of the three defendants that were arrested in connection with this case. The report speaks only of "three negro male occupants." What's more, there are no identifying descriptions in the report, nor is there any indication that the three occupants of the vehicle chased by Adams were those eventually identified as Gabriel, Williams and/or Turner.
Police reports are considered confidential and generally the state may not be compelled to produce them for inspection. State v. Tauzier, 397 So.2d 494 at 502 (La.1981); State v. Franks, 363 So.2d 518 at 520 (La.1978). A defendant may obtain a copy of a police report upon a "showing... that one or more of the material statements therein are contrary to the sworn testimony," State v. Adams, 302 So.2d 599 at 604 (La.1974). Where a defendant can show a police report to be inconsistent with a witness' testimony, the police report will be disclosed for the purpose of establishing that inconsistency. State v. Foret 315 So.2d 278 (La.1975); State v. Cryer, 262 La. 575, 263 So.2d 895 (1972); State v. Nails, 255 La. 1070, 234 So.2d 184 (1970); Compare State v. Babin, 319 So.2d 367 (La.1975).
The trial court's ruling in the case of defendant Gabriel was erroneous.[17] In the cross examination of Adams, defendant was improperly denied his right to use the police report to contradict Adams' trial testimony that the report confirmed his having identified Gabriel, to Steinkamp, on the day of the robbery.
In summary, Larry Gabriel was the only one of the three defendants to present an alibi defense, contending he was not at the location of the robbery at the time of the robbery. Larry Gabriel's conviction rested for the most part on the identification testimony of lay witness Fredricks and Officer Adams. Evidence with the potential for seriously undermining the credibility of the identification testimony of these two crucial witnesses was improperly excluded. Larry Gabriel's ability to present his defense fully was substantially prejudiced by the trial court's ruling that denied the jury access to two pages of Fredricks' preliminary examination testimony and denied Gabriel's defense counsel access to that portion of the police report containing Officer Adams' account of the incident.
Accordingly Larry Gabriel's conviction and sentence are set aside and his case remanded for a new trial.

Decree
For the foregoing reasons, the conviction and sentence of Larry Gabriel is reversed, and his case is remanded to the district court for a new trial. The convictions and sentences of James Turner and Freddie Williams are affirmed.
AFFIRMED IN PART: REVERSED IN PART AND REMANDED.
NOTES
[1] The specific guilty verdicts for each armed robbery for each of the defendants were Gabriel, 10-2, Williams, 11-1, Turner, 12-0.
[2] There is some conflict in the testimony regarding how many men entered the homestead. Of the six employees and customers on the ground floor, two testified that there were two (2) men involved in the robbery; four others stated that there were three (3) involved. A seventh witness stated three (3) men forced him out of his car; the eighth witness, who watched the robbery on the homestead's video cameras from the second floor, stated that three (3) left the building after the hold-up.
[3] Most witnesses agreed that only one of the robbers was armed, but the gun was described both as a "snub-nosed" and as a "long-barrel" hand gun.
[4] The record contains a stipulation, as to the time the following communications were made over the police radio:

12:52:24 p.m. inquiry re: any disturbance in area
12:54:23 p.m. suspects abandon car and flee on foot on Rayne
12:59:32 p.m. two suspects arrested
13:02:44 p.m. one suspect arrested
13:06:57 p.m. weapon recovered.
[8] Defendants Turner and Williams joined Larry Gabriel in complaining of trial error in these two matters. (Assignments of Error 9B and 10, Turner and Williams) As will be discussed hereinafter in the opinion, the merit of these assignments, insofar as defendant Gabriel is concerned, rests on his presentation of an alibi defense at trial and on there being little else except the identification evidence to link him either to the escape vehicle, to the other two defendants or to the robbery itself. Such is not the case with either Turner or Williams. See note 9, infra.
[9] Apart from the identification testimony, there is ample evidence to link Turner and Williams both to each other and to the robbery itself. Turner and Williams were arrested together in each other's company clearly exiting the woods into which the alleged robbers had fled after abandoning the car. From Turner and Williams were recovered a plastic bag containing bait money from the homestead and the set of car keys taken from one of the victims of the Pelican Homestead robbery. Also Williams and Turner were respectively and individually in possession of the right and left hand of a matching pair of rubber gloves used in the robbery.
[10] Defense counsel for Gabriel tried unsuccessfully to have the police report of the incident introduced at this point to confirm or deny whether Golden reported these details to Officer Skeinkamp on the day in question.
[11] This gentleman and potential witness has since died.
[12] It is worth noting, however, that even the manager Darlene Fredricks admitted at trial that her identification of Gabriel was based on the light brown, khaki slacks that he was wearing when arrested. She further admitted at trial that the shirt Gabriel was wearing at the time of his arrest was clearly not the shirt worn by the man wearing the light brown, khaki slacks during the robbery.
[13] At the time of the lineup at the homestead the day of the robbery, the defendants were not identified by name. The three apprehended were placed in a row and the witnesses designated their respective identifications, the one on the right, the one on the left, or the one in in the middle. Later the state placed names to these earlier designations. Perhaps there had been an error in recording the names of the two robbers that Fredricks had identified. If so, this might account partly for the apparent inconsistency in Fredricks' testimony, i.e., her allegedly having identified Gabriel at the homestead lineup, and her testimony just six weeks later at the preliminary hearing, that she was unable to identify Gabriel as one of the robbers.
[14] The two pages comprised all of Fredricks' preliminary examination testimony on the subject of her ability to identify Gabriel and represented completely the relevant inconsistency. See State v. Rudolph, 332 So.2d 806 at 813; State v. Lewis, 354 So.2d 566 (La.1978).
[15] This is the subject of an assignment of error by Turner and Williams which, as more fully discussed in the unpublished appendix, we find non-meritorious.

Adams, not only a police officer but also a victim in this case (the shots fired at Adams formed the basis for the attempted second degree murder charge), encountered defendants at the stationhouse while on his way to deliver his report to Steinkamp. Adams' confrontation and identifications are governed by those cases dealing with inadvertent meetings between victim and suspects. Where there is no indication of impropriety or suggestiveness, and where the identifications were immediate and definite, an out-of-court identification is both reliable and admissible. State v. Loyd, 425 So.2d 710 at 713 (La.1982); Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Absent a showing of prejudice, the state's failure to disclose the fact of an inadvertent stationhouse identification does not mandate a mistrial. State v. Norwood, 396 So.2d 1307 (La.1981).
[16] Because of these comments, we were even concerned that there was another police report being viewed in camera that had not been included among the papers sealed by the trial court upon defense counsel's request. Extensive inquiries by the Clerk of this Court into this matter at our direction, however, have proven otherwise. We are satisfied that the copy of the police report lodged under seal with the record on appeal is the only police report in this case.
[17] In his Assignment of Error No. 9B, Williams presents the same argument as Gabriel, relative to Officer Adams' testimony. There is, however, a substantial difference between the two defendants, Gabriel and Williams, as discussed more fully at notes 8 and 9, supra and note 6 of the appendix treatment of Argument VII (Assignments of Error 9A and 9BTurner and Williams). As relates to Williams, there was no reversible error in regard to this assignment.