553 So.2d 422 (1989)
STATE of Louisiana
v.
Robert HARRISON.
No. 89-K-0712.
Supreme Court of Louisiana.
December 11, 1989.
Rehearing Denied January 18, 1990.
*423 Sherry Watters, Orleans Indigent Defender Bd., for applicant.
William J. Guste, Jr., Atty. Gen., Harry F. Connick, Dist. Atty., Susan Kreston, Jack Peebles, and Val Solendo, Asst. Dist. Attys., for respondent.
DIXON, Chief Justice.
Defendant Robert Harrison was indicted for violation of R.S. 14:30.1, second degree murder, resulting from a street corner altercation which culminated in a shooting death. After two mistrials, one by a hung jury, defendant was found guilty of a responsive verdict, manslaughter, a violation of R.S. 14:31. Harrison was adjudged a habitual offender and sentenced to forty-two years at hard labor. Defendant appealed and after remand was resentenced to twenty-one years at hard labor. On his second appeal, the appellate court affirmed defendant's conviction. Defendant is now before this court on writs and presents two assignments of error.
The state's key witness was Cynthia Kinney. She testified that she was at the corner of St. Bernard Avenue and North Villere Street on June 27, 1984 at approximately 12:00 noon, when she saw Bill Davis emerge from a local grocery store with a bottle of wine. She knew him from the neighborhood and said that he appeared to be on drugs. From across the street, Kinney observed a vehicle approach, stop and double park in front of Davis. Defendant, who was also known to Kinney as "Red Top," left the car and began arguing with Davis. She stated that defendant began screaming at Davis and then struck him about the head and face. Defendant stepped back from Davis and shot him. He returned to his vehicle and sped away. Kinney claims to have gone into shock at this point. She asserts that this was why she failed to give a statement to the police until over a month later.
Dr. Richard Tracey, a forensic pathologist, testifying for the state, stated that he performed an autopsy on the victim, Davis. A single bullet through the heart was the cause of death. He discovered traces of morphine in Davis' blood and found evidence of a minor bruise on the right side of the victim's head.
Glenn Hall, the only witness for the defense, testified that he knew the defendant and the victim. Around noon on June 27, 1984, as he drove past St. Bernard Avenue and Villere Street, Hall saw defendant and Davis arguing. Davis had a knife and was holding it as if to stab the defendant. Hall saw Davis moving toward Harrison as Harrison backed up toward the curb. Hall asked the person he was riding with to park around the corner. When he got out of the car he heard a gunshot. As he rounded the corner, Hall saw the victim on the ground and the defendant leaving in a car. Hall held Davis' head as he died, and saw that Davis had a knife in his hand. He then saw someone kick the knife away. Hall could not see who kicked it, but heard someone say "Bootsie."
A knife was found in the gutter at the crime scene by Officer Aaron Blackwell, a crime scene technician for the New Orleans Police. He testified that the knife was approximately four inches long and folded, but did not appear to have been recently used when found. It had been raining for several days prior to the shooting and had begun to drizzle as the police conducted their investigation at the crime scene. Condensation and dirt on the knife made it impossible to lift any fingerprints. Detective Sam Geggia testified that the knife appeared to have been in the gutter for a while, judging from the sedimentation on it.
Police obtained an arrest warrant for the defendant based on information obtained subsequent to the day of the shooting. Before he was arrested defendant voluntarily surrendered to the police, accompanied by his attorney. Cynthia Kinney gave her statement to the police twenty days later.
*424 After Glenn Hall's testimony the defense rested. The state then called Alvin Joseph, nicknamed "Bootsie," to testify. He first identified Glenn Hall as someone he knew from the neighborhood. He stated that he was employed as a supervisor with the Department of Streets and that he was working at the time of the shooting so could not have been in the area when the crime was committed. He also denied kicking a knife from the victim's hand. He first learned of the incident after work that night. He also claimed to know of other persons named "Bootsie." On cross-examination Joseph stated that he received a note that had been left at his mother's, instructing him to call someone Joseph believed to be an attorney. Joseph called and spoke to a man he remembered only as "Gary." Joseph informed Gary that he had nothing to do with the shooting. He denied telling Gary that he arrived at the crime scene during his lunch hour and that he had seen a knife by the victim's right hand.
After the state's rebuttal, defense counsel attempted to call his investigator, Gary Eldridge, to impeach Joseph's testimony. The state objected claiming that this was an attempt at surrebuttal which it claimed to be prohibited under R.S. 15:282. Although he lost on the issue of his right to present surrebuttal testimony, defense counsel was permitted to proffer Gary Eldridge's testimony. According to Eldridge, his efforts to contact "Bootsie" led him to 1555 North Derbigny Street where he left a note with his name and number.[1] Eldridge was subsequently telephoned by a man who identified himself as "Bootsie." "Bootsie" informed him that he had been at the crime scene during his lunch break and had seen a knife lying on the ground near the right hand of the victim. Additionally, Eldridge recounted that he had spoken to "Bootsie" in the hall at defendant's second trial but at that time "Bootsie" repudiated his prior statement, stating that he had never been at the crime scene. Eldridge recalled that "Bootsie" appeared agitated and that he had said there was no way he was going to appear and be involved.
Before closing arguments, a juror notified the court that she knew Alvin "Bootsie" Joseph as a former neighbor. She had known him for about ten years but was not in "Bootsie's" age group. She explained that she had not responded during jury selection when the witness list was read because she did not recognize "Bootsie" by his given name. She insisted that their relationship was not a close one nor would her acquaintance with him influence her in any way.
Defense counsel requested a mistrial or that the juror be removed. His requests were denied because the trial court found that the juror would be fair and impartial.
In his first assignment of error defendant contends that the trial court erred in refusing to allow in evidence the testimony of Gary Eldridge to impeach the state's rebuttal witness, Alvin "Bootsie" Joseph.
In affirming the trial court's ruling, the appellate court set forth R.S. 15:282 as the controlling law:
"The prosecution has the right to rebut the evidence adduced by the defendant, but the defendant is without right to rebut the prosecution's rebuttal."
As a general rule, the defendant is without a right to rebut the prosecution's rebuttal; however, this statute is not an absolute bar to all evidence the defense may seek to present after the state's rebuttal.
Article 1, § 16 of the Louisiana Constitution of 1974 provides:
"An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf."
Just as constitutional provisions protect a defendant's right to confrontation, a defendant's right of impeachment is protected by statute:

*425 "Each side has the right to impeach the testimony and the credibility of every witness sworn on behalf of the other side." R.S. 15:486. (Emphasis added).
Both the state and defense have the right to impeach every witness sworn on behalf of the other side. State v. Gabriel, 450 So.2d 611, 616 (La.1984); State v. Heard, 408 So.2d 1247, 1250 (La. 1982); R.S. 15:486; R.S. 15:493.
The state offered the testimony of an eyewitness, Cynthia Kinney, who stated that when the victim was shot, he did not have a knife in his hand. Defendant's entire case rested upon the testimony of Glenn Hall. His testimony was that the victim was the aggressor, shot by defendant in self-defense. He further testified that the victim had a knife in his hand when he died, but that someone kicked it away. Although he could not see who kicked the knife, he did hear someone in the crowd say "Bootsie." To rebut Hall's testimony, the state presented Alvin "Bootsie" Joseph who testified for the first time on rebuttal. He testified that he was not at the crime scene and had not kicked a knife away from the victim's hand. In an attempt to impeach Joseph, the defense called Gary Eldridge as a witness for the purpose of exposing prior inconsistent statements made by Joseph. It was this surrebuttal testimony by a defense witness that the court of appeal found to be "clearly prohibited by La. R.S. 15:282." State v. Harrison, 541 So.2d 252, 254 (La.App. 4th Cir. 1989).
The normal order of trial is provided for in C.Cr.P. 765(5) as follows:
"(5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument."
It is within the court's discretion to allow testimony after rebuttal concerning prior inconsistent statements made by the witness on rebuttal.
The defense procedure for impeaching the credibility of the rebuttal witness was proper.
"Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible." R.S. 15:493.
On cross-examination Joseph admitted to receiving notes and calling someone in response to those notes. He denied telling the person he called that he had been at the crime scene and that he had seen a small knife by the victim's hand. He remembered that the man he called was named Gary. He also admitted to meeting someone in the hallway of the courthouse to whom he denied being at the scene of the crime. Although defense counsel did not call Joseph's attention to the particular date of his phone conversation with Gary, the record establishes that Joseph and Eldridge were testifying about the same conversation. The impeachment evidence was admissible, since Joseph denied making the prior inconsistent statements. Having embarked upon the impeachment of Joseph, defense counsel had to finish the task by calling Eldridge or risk bolstering the credibility of the witness' testimony. "Unless the inconsistency is introduced and proven, some or all members of the jury may be misled by the witness into believing either that there was no inconsistency or that the inconsistency was simply a lawyer's manipulating the witness' testimony to his client's advantage." State v. Gabriel, supra at 616.
In State v. Anderson, 45 So. 267 (La. 1907), defense counsel found himself in the same situation as the case at bar. Defendant was tried for assault by shooting at the victim in her own home. In response to her accusation that he broke into her home, defendant asserted that he had been invited in by one of her daughters. The daughter was called for the first time on rebuttal *426 and denied his assertion. Defendant then produced a letter he alleged the daughter had written him in prison. She denied ever writing to him. After the state had closed its rebuttal, defense requested leave to prove by expert testimony that the letter produced was written by her and thereby impeach her testimony. The trial judge refused the defendant's request. This court reversed the conviction. It opined that the letter's principal use was to impeach the witness by showing that she testified falsely when she denied writing it. "A defendant is entitled at some period of the trial to discredit all witnesses brought against him." State v. Anderson, supra at 268, citing State v. Spencer, 45 La.Ann. 10, 12 So. 135 (1892). A similar situation arose in State v. Kinchen, 126 La. 39, 52 So. 185, 189 (1910). The state's witness, testifying for the first time on rebuttal, was used to impeach defense witnesses. The defendant offered testimony of two witnesses alleging that the rebuttal witness had made prior inconsistent statements, but the trial court refused to allow them to testify. This court reversed and on rehearing held "[we] cannot approve a ruling which would in every criminal case leave it discretionary with the trial judge to refuse to permit the accused to impeach the witnesses for the prosecution called to rebut the evidence adduced in behalf of the defendant."
As discussed in 6 Wigmore, Evidence, § 1874 (Chadbourn Rev. 1974), "[f]or the opponent's case in rejoinder [surrebuttal] there remain properly only two sorts of evidence, namely, evidence explaining away the effects of new facts brought forward by the proponent in rebuttal, and evidence impeaching the witnesses testifying in rebuttal." (Emphasis added). Wigmore added that "for evidence legitimately received in rejoinderin particular, evidence impeaching rebuttal witnessesthere has been no prior opportunity to adduce it, and hence it is here entitled to be received, without depending on the court's discretion to relax the usual order ..." Id. See also Article 611 E, Louisiana Code of Evidence, and Author's Notes. The trial court abused its discretion in refusing to permit surrebuttal testimony in this case.
The accused's right to impeach the credibility of the state's witnesses stems directly from the Sixth Amendment to the United States Constitution, which secures to the defendant the opportunity of cross-examination. United States v. Owens, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988); Delaware v. Fensterer, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Additionally, the United States Supreme Court has noted that "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." Davis v. State of Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974). The denial of an accused's confrontation rights with regard to impeaching a witness is subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). To prove harmless error, the state must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967). We find that this was not harmless error.
The defense's theory was that of justification or self-defense. In support of that theory, the defense called one witness, Hall, an eyewitness to the events immediately preceding the shooting. The entire defense was predicated upon his testimony. His credibility was central to the defendant's claim of innocence, thus any attack on his credibility went to the very heart of Harrison's defense. Under these circumstances, it cannot be certain beyond a reasonable doubt that the trial court's failure to allow surrebuttal to impeach "Bootsie's" testimony did not contribute to the verdict obtained.
For the reasons set out above, the defendant's conviction is reversed and the sentence set aside; the case is remanded to the *427 trial court for further proceedings in accordance with law.
NOTES
[1] On cross-examination Joseph stated that his mother lived in the 1500 block of North Derbigny Street. In addition, when asked by defense counsel if he recognized the telephone number 944-2789, Joseph responded that it was his grandmother's number and that he had given the number to Gary in the event he needed to be contacted in the future.