|2SOL GOTHARD, Judge.

STATEMENT OF THE CASE

On January 18, 1996, after a seven day trial, a twelve member jury by an 11 to 1 vote found Lutgardo “Luke” Silva in violation of LSA-R.S. 14:30.1, and guilty of the second degree murder of Bret Kreller. The trial court sentenced defendant to the mandatory term of life imprisonment, without benefit of parole, probation, or suspension of sentence.

STATEMENT OF FACTS

On the night of November 3, 1994, eighteen-year-old Bret Kreller and his friend Christian Alfonso went to the New Orleans Lakefront to socialize and drink beer. After-wards, they proceeded to Sluggo’s Bar in Metairie, where they played pool and drank more beer. Kreller’s friend Kimberly Berry testified that she was at Sluggo’s on the evening of November 3, and had a long conversation with Kreller.
13At about 11:30 p.m., Berry and Kreller walked outside the bar so Berry could make a telephone call. Berry testified that as she walked around the side of the building, defendant Lutgardo “Luke” Silva approached her and asked her if she was “still a f_ing Lakeview chick.” [1] Silva directed other obscenities to her, including “slut” and “bitch”. Kreller and Silva exchanged words over the incident, and Kreller went back inside the bar with Berry.
Berry and Kreller conversed with each other until about 12:45 or 1:00 a.m. on November 4. Berry testified that she exited the bar with Kreller and a group of his friends. She told Kreller good-bye, and walked to her car. Berry stated that Kreller appeared slightly intoxicated. As she got into her car, she saw Silva approach Kreller. She heard the two speak to each other, but could not hear what they said.
Defense witnesses Jerry Travis Watkins and Shaun Paulin testified that it was Kreller who initiated the confrontation with Silva at Sluggo’s. Watkins stated that Kreller was intoxicated and was acting like a “wild man”, attempting to fight with Silva. He further testified that Silva did not know who Kreller was.[2] According to Watkins, defendant and *1121 Kreller had a verbal altercation outside the bar, and Sluggo’s employees told them to leave the premises. Watkins further testified that Kreller told Silva to follow him so they could continue the fight elsewhere.
Kreller and Alfonso rode in Kreller’s pickup track to the home of his friend, David Doerer at 8845 25th Street, near the intersection of 25th and Michigan in Kenner. David Doerer lived there with his grandmother. Silva and Watkins followed in Silva’s blue Thunderbird. Some of Silva’s other friends, including pDavid Babin and Shaun Paulin, followed. When the group arrived at Doerer’s house, Kreller and Silva began fighting in a neighbor’s driveway. After thirty or forty-five seconds, Kreller was on top of Silva and it was apparent Kreller had the advantage.
Shaun Paulin and Silva’s other friends joined in the fight, hitting and kicking Krel-ler. David Doerer testified that at this point he came out of the house and saw a pile of people on top of Kreller. One person was kicking Kreller in the head. Doerer went to Kreller’s aid, hitting Silva under the arm with a baseball bat. Doerer then swung the bat at Silva’s friends, chasing them into the street. Silva then pulled a .38 caliber handgun from his waistband and fired. The bullet hit Kreller in the center of his forehead, and he fell to the ground, dying almost immediately. Silva and his friends fled the area. Alfonso and Doerer remained at the scene.
Deputy David Short arrived at the scene within a minute after receiving the call over the police radio. He secured the scene, and called for backup personnel. Officers reporting to the scene included Lieutenant Don English, Detective Alvin Wickboldt, Detective Philip Ramon, and Detective Ralph Sacks. Det. Ramon gathered information at the scene, including descriptions of Silva and his car, and addresses where he might be located. At about 4:30 a.m. on November 4, Det. Ramon proceeded to Silva’s father’s house on Acadia Street in Metairie. Ramon spotted Silva’s car parked in front of the premises, and called for uniformed backup officers. Deputies Timothy Gandy, Ron Miller, and Michael Brocato responded.
Luke Silva’s father answered the door and told the officers that Silva was asleep inside the house. Silva then walked down the stairs and Det. Ramon ordered him outside. The officers patted down Silva for weapons and found none. They advised Silva that he was under investigation for murder, and he responded, “I did Rnot want to kill anyone.” The uniformed deputies mirandized Silva and transported him to the Detective Bureau.
Det. Ramon obtained Silva’s father’s consent to search the house. The search uncovered six firearms, all legally registered to Silva’s father or grandfather. Four of the guns were seized for testing, but not one of them was the murder weapon.
Luke Silva gave two recorded statements to Det. Sacks at the Detective Bureau on the morning of November 4. Defense counsel offered a stipulation at trial that both statements were made knowingly and voluntarily.
The first statement began at 5:48 a.m. and ended at 5:57 a.m. In that statement, Silva admitted to participation in the fight after leaving Sluggo’s that morning, but did not admit to firing a gun. After the first statement was completed, Det. Sacks told Silva he did not believe Silva had told the truth. Silva agreed to give a second statement.
The second statement began at 6:35 a.m. In the second statement, Silva admitted to an altercation at Sluggo’s bar with a person he claimed he did not know. Silva further stated that he followed that person to a house, where they fought. Silva stated he had a rusty .38 caliber gun in the waistband of his pants, although he did not intend to use it. He said that the gun fell to the ground during the fight and when a man hit him with a bat, Silva picked up the gun and fired it into the air. Silva stated he did not intend to shoot anyone. Silva further stated he left the scene by himself, and threw his gun out of the car window.
After the statements were completed, Silva was formally arrested. Silva told Detective Sacks that he had discarded his gun in the David Drive canal at Veterans ^Boulevard near Chapelle High School. Officers searched the area for the gun, but were unable to find it.

*1122
ASSIGNMENTS OF ERROR

On appeal, defendant raises the following assignments of error:
1. The State presented improper rebuttal evidence which, coupled with the trial court’s refusal to permit surrebuttal, created irreparable prejudice; the state purposefully reserved part of its case in chief for rebuttal, and interjected new issues into the case which defendant could not counter.
2. The contradictory and inconsistent testimony of the State’s witnesses does not support the verdict: evidence of mitigating factors was established sufficient to reduce the murder to man- • slaughter.

ERRORS PATENT REVIEW

We have reviewed the record for errors patent and have found that the sentencing transcript does not indicate that the defendant was informed of the prescriptive period for post conviction relief. Under LSA-C.Cr. P. Art. 930.8, the trial court may remedy this by sending written notice to defendant within ten days of the rendering of this court’s opinion and then filing written proof in the record that defendant received such notice. State v. Kershaw, 94-141 (La.App. 5 Cir. 9/14/94), 643 So.2d 1289; State v. Procell, 626 So.2d 954 (La.App. 3 Cir.1993); State v. Sumlin, 605 So.2d 608 (La.App. 2 Cir.1992).

ASSIGNMENT OF ERROR ONE

Defendant argues that the court improperly allowed the state to offer the testimony of Eudora and Willard Troselair, as rebuttal testimony and that it should have been introduced in the state’s case in chief. Defendant further complains that he was prejudiced by the court’s refusal to allow him surrebuttal and he thereby was denied his constitutional right of confrontation. Defense counsel strenuously and repeatedly objected to the court’s ruling at trial and the trial court consistently 17denied defense counsel’s objections. The defense had the opportunity to cross-examine the state’s rebuttal witnesses.
LSA-C.Cr.P. art. 765 states the normal order of trial as follows:
(5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument.
Although the article provides the prosecution a statutory right to rebut evidence introduced by the defense, the defendant does not have a right to rebut the state’s evidence. The introduction of additional evidence before argument is within the sound discretion of the trial court. State v. Washington, 606 So.2d 838 (La.App. 2 Cir.1992), writ denied 612 So.2d 56 (La.1993); State v. Howard, 449 So.2d 69 (La.App. 4 Cir.1984). See also: LSA-C.E. art. 611(E).
Proper rebuttal evidence is that which is offered to explain, repel, counteract or disprove facts offered in evidence by an adverse party. State v. Deboue, 552 So.2d 355 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Glover, 93-959 (La.App. 5 Cir. 3/29/94), 636 So.2d 976, writ denied 94-1460 (La.9/3/96), 678 So.2d 544. The state is allowed to present rebuttal evidence because it is required to present its case first, and is unable to anticipate the exact nature of the defense. The state may use rebuttal evidence to strengthen its case in chief. State v. Huizar, 414 So.2d 741 (La.1982); State v. Glover, supra. However, it is well settled that the state may not introduce new issues or facts on rebuttal, or reserve part of its ease in chief to use after the defense has rested. State v. George, 95-0110 (La.10/16/95), 661 So.2d 975; State v. Deboue, supra.
The Trosclairs’ testimony pertained to the positions of Silva and Kreller at the moment of the shooting. Defendant complains because the Troselair testimony praised new issues and facts, he was entitled to offer surrebuttal evidence to impeach their testimony. Thus, the issues are whether the evidence produced by the state was proper for rebuttal and whether the trial court abused its discretion under Article 765 by refusing to allow the defendant surrebuttal.
*1123 The two eyewitnesses produced by the state in its case in chief were Christian Alfonso and David Doerer. Doerer testified that in the moments leading to the shooting, Kreller had defendant in a headlock and was punching him. Defendant and Kreller separated and defendant rose from the ground. Defendant raised his arm, although Doerer did not notice whether there was anything in defendant’s hand. Doerer turned his head to the right, then heard a shot fired. Doerer dove to the ground, not realizing that Kreller had been shot. Doerer did not actually see the shot fired, thus he could not know defendant’s exact position at the precise moment when the shot was fired.
Christian Alfonso testified that he saw defendant fire the gun and that defendant was facing Kreller and was two feet away from him. Kreller was standing upright and defendant was more upright than crouched and was falling backwards when he fired the shot. Alfonso saw the flash and ran. When defendant fired the gun, the weapon was at a level between Alfonso’s head and shoulders.
The state offered strong circumstantial evidence as to the positions of defendant and victim at the time of the shooting through the testimony of Dr. Susan Garcia, the forensic pathologist who performed the autopsy on Bret Kreller’s body. Dr. Garcia testified during the state’s ease in chief that the track of the bullet (right to left, down and back) was inconsistent with a shot fired into the air. The doctor also noted that the skin around the entrance wound contained “stippling” (small, round marks) that indicated the gun was fired from a distance of about twelve to 19eighteen inches. She noted that a randomly fired gunshot would not cause stippling. Dr. Garcia’s expert opinion was that the victim was either shorter or lower than the shooter and that his head was beneath the muzzle of the gun.
Defendant’s defense was justification or self-defense. He also alleged the mitigating factor of “heat of blood”. Witnesses for both the state and the defense testified that David Doerer hit defendant with a baseball bat during the course of the fight. Defendant contended that he fired into the air in order to warn Doerer away from him. The defense suggested that the shooting was purely accidental.
Defense witnesses Jerry Travis Watkins and Shaun Paulin testified that they were at the scene during the fight which initiated the shooting. However, neither Watkins nor Paulin saw the shot fired. Defense witness David Babin testified when the shot was fired, he was fighting Alfonso on the sidewalk, so he did not see Kreller and defendant at the crucial moment and was unable to testify as to their relative positions. He did testify, however, that prior to the gunshot, he saw defendant crouched on the ground with Bret Kreller leaning over the defendant and hitting him. Babin saw a blast go up in the air and he ran to his car.
Defendant was the only defense witness who testified to each party’s position at the precise moment of the shooting. Defendant stated that a man hit him under the arm with a baseball bat, knocking him to the ground. The man looked as if he would strike defendant again, so defendant- grabbed his gun. Defendant fired a warning shot, because he was afraid the man would “bash his brains out” with the bat. Defendant’s testimony was that he pointed the gun up and backwards, over his shoulder. In his statement to the police, defendant said he pointed the gun “up in the air.” Defendant testified that Bret Kreller- was behind him when the gun wentlipoff. Defendant further stated that he only saw the man with the bat in front of him when he fired the gun and that he did not know Kreller was behind him.
Prosecutors argued that their purpose in calling rebuttal witnesses Eudora and Willard Trosclair was to impeach defendant’s testimony regarding the parties positions at the moment of the shooting. The Trosclairs testified that their house sits on the corner of Michigan and 25th Streets, about thirty feet from where the murder occurred. They were awakened by noise early on the morning of November 4, 1994. When they looked out of their bedroom window, they saw several people involved in a fight.
Mrs. Trosclair called 911. When she returned to the window, both she and Mr. Trosclair saw the flash of a gunshot. Al *1124 though it was dark, they could tell by the flash which individual had fired the gun. The Trosclairs both testified that the gunman was standing straight up, facing the victim. The victim was also standing up, and when he was shot, he immediately fell over backwards. Mrs. Trosclair testified that the gunman was not aiming the gun backwards. Neither Mr. nor Mrs. Trosclair saw anyone wield a baseball bat.
Defendant contends that his defense was irreparably damaged by the Trosclairs’ testimony, and that his right to a defense was violated by the trial court’s refusal to allow him surrebuttal. Defendant argues that the state improperly reserved part of its case in chief until after the defense had rested in order to prevent defendant from responding to the new evidence.
In recent cases, the Louisiana Supreme Court has found a violation of the defendant’s Sixth Amendment fundamental right to present a defense where the state introduced damaging rebuttal testimony, and where the trial court nevertheless denied the defense an opportunity for surrebuttal. See, State v. George, supra; \ nState v. Harper, 93-2682 (La.11/30/94), 646 So.2d 338; State v. Harrison, 553 So.2d 422 (La.1989).
While the Trosclairs are the only neutral eyewitnesses whose testimony pointedly contradicts that of defendant, they were not the only neutral witnesses whose testimony contradicted the defendant. Dr. Garcia’s expert opinion was that the gun was fired at close range from a standing position. Even without the Trosclair’s testimony, the jury could have easily found against the defendant.
Furthermore, while the Trosclairs’ testimony was damaging to defendant’s case, it cannot be said that the testimony interjected new issues into the trial. Dr. Garcia’s testimony during the state’s case in chief made clear the state’s position that defendant purposely fired his gun at the victim while the two stood face-to-face.
Defendant’s strongest argument is that he was entitled to impeach the Trosclairs. Had defendant been offered the opportunity to present surrebuttal, however, it is not apparent from either the record or defendant’s brief that he would have produced any evidence that had not already been introduced in his defense. Anyone who might have contradicted the Trosclairs’ testimony had already testified. In the aforementioned Supreme Court cases, the defendants named specific evidence they wished to introduce in surrebuttal. In the instant case, defendant did not do so. We note that a crucially important factor is that the defense was given the opportunity to impeach the Trosclairs through cross-examination.
The trial court allowed the state’s case in rebuttal for the purpose of impeaching testimony given by defendant and defense witness David Babin. The state argued that it required an opportunity for rebuttal, because when presenting its case in chief, it did not know what defendant’s testimony would be.
| ^Defendant argues the state was put on notice as to what his defense would be prior to trial and that the state could have used the Trosclairs’ testimony in its case in chief, but reserved their testimony for rebuttal in order to place the defense at a disadvantage. While it is true that the state had possession of defendant’s taped statements prior to trial and in fact offered them into evidence, defendant’s testimony at trial offered more detail regarding the shooting, and varied somewhat from the statements.
The jurisprudence allows the state to bolster its case in chief through the use of rebuttal evidence. We do not find the trial judge abused his wide discretion under Article 765(5) in denying defendant the opportunity for surrebuttal, where defendant failed to indicate that he had any new evidence that he would provide during surrebuttal and where the defendant cross-examined the rebuttal witnesses.

ASSIGNMENT OF ERROR TWO

By his second assignment, defendant argues that the state failed to prove that he had the specific intent to kill Bret Kreller. Defendant contends that the evidence at trial showed that he fired he fired his gun out of sudden passion and in the heat of blood. Defendant argues that at most, the facts adduced at trial support a verdict of manslaughter.
*1125 The constitutional standard for testing the sufficiency of evidence as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based in proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965 (La.1986); State v. Honore, 564 So.2d 345 (La.App. 5 Cir., 1990), writ denied, 569 So.2d 968 (La.1990).
lisln order to convict a defendant of second degree murder, the state must prove that defendant (1) killed the victim, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. State v. Thorne, 93-859 (La.App. 5 Cir. 2/23/94), 633 So.2d 773. It is undisputed that defendant fired the shot that killed Bret Kreller. Thus, the issue is whether the state proved the defendant had the requisite specific intent to kill or inflict great bodily harm.
Specific intent to kill or inflict great bodily harm, as an element of second degree murder, is a state of mind which may be inferred from circumstances and actions of the defendant. State v. Hill, 93-405 (La.App. 5 Cir. 3/29/94), 636 So.2d 999, writ denied, 94-3144 (La.9/1/95), 658 So.2d 1259; State v. Broussard, 560 So.2d 694 (La.App. 3 Cir.1990), writ denied, 566 So.2d 981 (La.1990). Defendant’s testimony was that he did not know Bret Kreller prior to the night of the murder, and that Kreller had antagonized him by instigating the fight at Sluggo’s Bar. However, several state witnesses testified to four incidents occurring in the two years preceding the murder in which defendant threatened to kill Kreller.[3]
Mark Verhoeven, who knew both Silva and Kreller, testified that he had a party at his home in the fall of 1992. Among the guests were Verhoeven’s friends Bret Kreller, Marshall Monica, and Clint Frischertz. Silva and several of his friends arrived at the house in two cars. Verhoeven asked the group to leave and an argument ensued. Defendant threatened to “put a cap in” Verhoeven’s friends, including Kreller, meaning that Silva would shoot them. Silva and his companions then left the premises. State’s witnesses Mark Frischertz, Marshall Monica, and Clint Szubinski also testified that they were present during this incident and their 1 udescriptions were essentially the same as Verhoeven’s. Szubinski testified that as Silva and his companions left the Verhoeven house, he saw a gun in Silva’s car.
There was another confrontation between the two groups in the summer of 1993. Clint Szubinski testified that on a weekend afternoon, he, Bret Kreller and others rode to the home of their friend, Troy Campbell. Campbell lived on the same street as Greg Ingram, a friend of Silva’s. As Szubinski and his companions rode past Ingram’s house, they saw a group which included Silva in the open garage. Defendant and his companions shouted at Szubinski’s group. Szubinski and his friends parked at Campbell’s house and walked to the Ingram house.
The two groups engaged in a heated verbal confrontation. Silva came out of the garage with a baseball bat and several others held pool sticks. At one point, Greg Ingram came out of the house with a handgun. Ingram pointed the gun at Mark Verhoeven’s face, screaming that he was going to shoot. The clip fell out of Ingram’s gun and Paul Ver-hoeven, Mark’s brother, picked it up. At some point defendant grabbed the gun and pointed at the other group. Szubinski’s group returned to Campbell’s house. Mark Frischertz, Mark Verhoeven, and Marshall Monica testified in essentially the same manner with regard to the incident. Monica stated that when defendant had the gun, he pointed it directly at Kreller, and threatened to kill him.
A third such incident occurred in the spring of 1994 at Ecole Classique, the school Szubinski and Frischertz attended and which Silva had formerly attended. Frischertz called Marshall Monica of Jesuit High School from Ecole during the lunch period and asked that Monica and Kreller meet them on school grounds at dismissal time. Frischertz and Szubinski feared that Silva and some of *1126 his friends would attempt to attack them as they left school. After classes were dismissed, | igSilva and a black male identified as Lionel[4] were on Ecole Classique grounds in Silva’s car. Monica and Kreller were also there, along with friends Eugene Vanery and Paul Barrilleaux. Silva wore brass knuckles, and Lionel wore a glove with a metal bar across the knucldes. Szubinski testified that during that incident, he saw Silva motion to his waistband as if he had a gun. Szubinksi saw the form of the gun under Silva’s shirt, but did not see the gun itself. A verbal confrontation ensued, during which Silva told Kreller, “I’m going to kill you. I’m going to put a cap in your ass.” Lionel shouted, “Who wants to get knocked out?” Teachers from Ecole Classique intervened and the situation was diffused.
In the summer of 1993, Silva encountered Kreller at Friar Tuck’s, a bar on Carrollton Avenue in New Orleans. Kreller was at the bar with Marshall Monica and Mark Fris-chertz. Kreller and Monica were on the second floor of the bar playing pool when Silva and three or four companions approached them. Silva told Kreller, “Let’s go outside right now and end this.” Using a hand motion, Silva indicated he had a gun. Kreller and his friends left the bar and Silva followed them across Carrollton Avenue. Silva motioned to his belt and said to Kreller and his companions, “You all better go, I’ll shoot all of you.”
The testimony of defense witnesses confirms that the aforementioned incidents occurred, although the defense witnesses alleged that it was Kreller and his friends who were the aggressors each time. The jurors gave more weight to the testimony of the state’s witnesses. The jury was in the best position to observe the demeanor of each witness and to make a determination as to each one’s reliability. The threats Silva made against Kreller on the foregoing occasions are indicative of intent to kill or do great bodily harm. Moreover, Silva himself testified that he madej^a conscious decision to follow Kreller on the night of the murder and to fight "with him. Silva stated it never occurred to him to let the argument pass and to go home.
The testimony tends to show that defendant purposely aimed and fired at Kreller and that the defendant and the victim were facing each other at the time of the shooting. This court has found that aiming a firearm directly at a victim is indicative of intent to kill or inflict great bodily harm for the pur-' pose of proving second degree murder. State v. Thorne, 633 So.2d at 777. See also: State v. Clark, 93-1470 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, writ denied, 94-2715 (La.2/9/95), 649 So.2d 418.
The other eyewitnesses who testified on behalf of the state were David Doerer and Christian Alfonso. As discussed above, Doerer did not see the shot fired. Alfonso did see the shot fired and his testimony is substantially the same as that of the Tros-clairs. Alfonso, like the Trosclairs, testified that defendant was facing the victim when he fired the shot, and that the two were about two feet apart.
One detail on which the Trosclairs’ testimony differs from that of other witnesses is with respect to David Doerer’s baseball bat. While the other eyewitnesses saw the bat, the Trosclairs did not. It is noteworthy, however, that the’ Trosclairs left their window for a period of time during the fight in order to call police. Defendant argues that the Troselair’s view must have been hindered by darkness. As to the darkness, the Tros-clairs testified that they were able to tell the position of the gun by the flash of light when it was fired.
Considering the foregoing, it appears that a rational trier of fact, viewing the evidence in this case in the light most favorable to the prosecution, would find the essential elements of the crime beyond a reasonable doubt. This assignment of error is without merit.
| i7For the reasons discussed, defendant’s conviction and sentence are affirmed and the matter is remanded to the trial court which is *1127 directed to provide the defendant with written notice under LSA-C.Cr. P. Art. 930.8.
AFFIRMED.

. "Lakeview” refers to a youth gang called the "Lakeview” ’ gang, referring to the “Lakeview” subdivision area of Orleans Parish.

. According to several state witnesses, Silva and Kreller had known each other for some time and had engaged in previous confrontations on several occasions.

. We note that defense witnesses portrayed Bret Kreller and his friends as aggressors in each of these incidents and denied that defendant ever threatened Kreller.

. Lionel and Silva were co-workers.