725 So.2d 565 (1998)
STATE of Louisiana
v.
Edwin CEDRINGTON a/k/a Edwin Codrington and Edward Johnson.
No. 98-KA-253
Court of Appeal of Louisiana, Fifth Circuit.
December 16, 1998.
*567 Katherine M. Franks, Baton Rouge, Louisiana, Attorney for Defendant/Appellant Edwin Cedrington a/k/a Edwin Codrington.
*568 Laurie A. White, New Orleans, Louisiana, Attorney for Defendant/Appellant Edward Johnson.
Paul D. Connick, Jr., District Attorney, Ellen S. Fantaci, Terry M. Boudreaux, Vincent Paciera, Jr., Assistant District Attorneys, Gretna, Louisiana, Attorneys for Plaintiff/Appellee.
Panel composed of Judges H. CHARLES GAUDIN, EDWARD A. DUFRESNE, Jr. and THOMAS F. DALEY.
DALEY, Judge.
In this appeal, defendants Edwin Cedrington a/k/a Edwin Codrington[1] and Edward Johnson appeal their convictions of second degree murder, violations of LSA-R.S. 14:30.1. Defendants were indicted, along with third defendant Terry Vasquez, for the murder of Tyrone Shropshire. Defendants were tried by a jury of twelve on September 16, 17, 18 and 19, 1997. On September 19, 1997, the jury returned a verdict of guilty as charged as to all defendants. Vasquez's appeal was lodged after Codrington and Johnson's; thus, this appeal concerns only the latter defendants.
On appeal, defendant Edward Johnson makes the following assignments of error:
1. Appellant was not fully notified of the offense charged when the state used a short form indictment charging him with first degree murder, and which was subsequently amended orally and by hand to second degree murder, no subsection noted, in violation of appellant's right to due process of law as guaranteed by Article 1, section 13 guaranteeing his right to be advised of the nature and cause of the accusation against him; and Article 1, Section 16, guaranteeing his right to a fair trial; and by the due process guarantees of Fifth and Fourteenth Amendments to the United States Constitution.
2. The state failed to prove that appellant was guilty of second degree murder by a sufficiency of the evidence as required by Article 1, section 2, of the Louisiana Constitution of 1974, guaranteeing due process of law; and the guarantee of due process of law afforded by the Fifth and Fourteenth Amendments to the United States Constitution.
3. The trial court erred when it determined that Kevin Simmons, a minor, was competent to testify, in violation of Article 1, section 2 of the Louisiana Constitution of 1974, which guarantees due process of law; Article 1, section 16 which guarantees the applicant the right to a fair trial; and the Sixth Amendment to the United States Constitution, guaranteeing the right to cross-examine one's accusers and the Fifth and Fourteenth Amendments to the United States Constitution, guaranteeing appellant's right to due process of law.
4. The trial court erred in failing to grant a severance of the defendants, in violation of appellant's rights as guaranteed by Article 1, section 2, of the Louisiana Constitution of 1974, guaranteeing due process of law; Article 1, section 13, enumerating the rights of the accused; and the due process considerations offered by the Fifth and Fourteenth Amendments to the United States Constitution.
5. The trial court erred in denying the defense's request to sequester witnesses at the motion hearing held on October 10, 1996, resulting in prejudice to appellant, in violation of his right to due process of law as guaranteed by Article 1, section 2 of the Louisiana Constitution of 1974; his right to a fair trial as guaranteed by Article 1, section 16 of the Louisiana Constitution of 1974; and the due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution.
Defendant Edwin Codrington makes the following assignments of error:

*569 1. The evidence was insufficient to sustain the verdict in that it failed to negate the possibility of misidentification by credible evidence, failed to establish that the appellant as a principal, had the specific intent to kill, failed to establish the elements of the underlying offense of aggravated burglary, and failed to establish the appellant was a principal to the crime.
2. The appellant was never "informed" as to the true nature of the charges against him despite a bill if [sic] particulars and open file discovery.
3. The three defendants should have been severed for trial
4. The jury charge was defective as to the law of principals and as to the definition of the underlying offense of aggravated burglary.
For the reasons that follow, we affirm the convictions.

FACTS
On November 11, 1995, at about 7:00 p.m., several people were gathered at a townhouse apartment at 1145 Tallowtree Lane, Apartment A, in Harvey. Maxine Pierre and her husband, Aaron Pierre, Sr., who resided at the apartment, had just returned home from grocery shopping. Mr. Pierre put away groceries, and he had returned from outside where he had put out the trash. Mrs. Pierre went to an upstairs bedroom after finishing with the groceries. Mrs. Pierre's son, seventeen-year-old Tyrone Shropshire, the victim, was in the living room playing cards with his brother, Aaron Pierre, Jr., as well as Lance Washington (a/k/a Lance Temple) and other friends identified as Hilton, Flowers, and Allan. Erica Pierre, the Pierres' eleven-year-old daughter, was sitting on the staircase near the kitchen door with Ebony Mills and five-year-old Kevin Simmons.
Tyrone Shropshire had gotten up from his card game and was attempting to bolt the sliding glass door in the kitchen using a wooden stick, when defendant Terry Vasquez forced his way in through the kitchen door, carrying a .12 gauge shotgun. Vasquez was wearing a red bandana over his lower face and a hooded jacket covered his head. Vasquez chased Tyrone up the stairs with the gun. As Vasquez passed Kevin Simmons on the stairs, he hit the boy in the head with the butt of the gun. Mr. Pierre ran up the stairs after Vasquez. Kevin Simmons, Lance Washington, and each of the Pierres testified that they heard a single gunshot after Vasquez and Tyrone ran upstairs.
After hearing the shot, Mrs. Pierre opened the bedroom door and Vasquez pointed the gun at her and said, "Give it up, bitch." Mr. Pierre, who was now at the top of the stairs, jumped on Vasquez and struggled with him, while Mrs. Pierre retreated and hid inside a closet. Defendants Edward Johnson and Edwin Codrington also entered the house by way of the sliding door. They also wore red bandanas on their faces, a signature trait of the 5.9 Bloods gang. They went upstairs and joined in the attack on Mr. Pierre. As the defendants left, one of them told the Pierres, "I got your baby."
Erica Pierre testified that after she heard the gunshot, she saw Johnson and Codrington enter by way of the kitchen door. Erica, Kevin Simmons, and Ebony Mills fled the house, and went to a nearby candy store to call for help. Lance Washington exited through the front door upon hearing the gunshot. He also went with the children to the candy shop, where he called police. Lance Washington testified that he saw only Vasquez enter the house, and that he has known Vasquez for most of his life. Aaron Pierre, Jr. heard the fighting, and hid in a downstairs closet in the stairwell. The door was ajar, and he saw Edwin Codrington, Edward Johnson, and Terry Vasquez run down the stairs. Johnson and Vasquez took off their bandanas, and all three men left by way of the kitchen door.
Aaron Pierre, Jr. and Erica Pierre testified that they saw all three men, and that they knew the men from the neighborhood. Kevin Simmons testified that he saw only Vasquez enter the house, but that he saw Johnson standing outside the back door. Kevin Simmons stated he knew the men prior to the murder. Mrs. Pierre testified that she did not get a good look at the gunman's face, and Mr. Pierre testified he *570 did not know the perpetrators, and could not identify them.
Deputy Wayne Hymes of the Jefferson Parish Sheriff's Office testified that he received a call at 7:34 p.m. about an illegal discharge of a weapon at the Tallowtree Lane residence. He responded to the call within minutes, and found fifty or sixty people outside the building. Deputy Hymes entered the house through the front door, and was directed upstairs by a distraught Mrs. Pierre. She led the officer to a bedroom, where Tyrone Shropshire's body lay in a large pool of blood. A window in the room was open, leading Hymes to infer that the victim had tried to escape. The deputy radioed to headquarters for backup officers.
Homicide detective Norbert "Jeff" Gurtner was notified of the murder at 8:14 p.m. on November 11. He was appointed the chief investigator, or "case officer" in the matter. He immediately separated all known witnesses, and had them transported to the detective bureau for questioning. While at the scene, Gurtner determined there were three perpetrators. He was given the names of "Bolo" (Edwin Codrington) and "T-Bone" (Terry Vasquez). During further interviews at the detective bureau, Dep. Gurtner arrived at the name of Johnson as the third perpetrator.
Dr. Fraser Mackenzie, a forensic pathologist, performed an autopsy on Tyrone Shropshire's body. MacKenzie testified that the victim died of a gunshot wound to the chest which hit both lungs, and cut the aorta in half. The doctor recovered a deformed lead pellet from the body. Mackenzie testified that he found traces of cocaine and marijuana in the victim's urine, but that the drugs did not contribute to his death.
Deputy Michael Kuzma of the crime scene division took photographs and collected evidence at the scene. Among the items he found near the body were a spent Winchester.12 gauge shotgun shell, a Federal .12 gauge live shotgun shell, and several pieces of cardboard wad.
On the night of the murder, Det. Gurtner showed a photographic lineup to several witnesses individually. Aaron Pierre, Jr., Erica Pierre, and Lance Washington all identified Terry Vasquez as one of the perpetrators. Kevin Simmons viewed the lineup on June 21, 1996, and also identified Vasquez. On November 12, 1995, Gurtner showed witnesses a book of photographs. From that book, Aaron Pierre, Jr. and Erica Pierre identified Johnson and Codrington as perpetrators. On June 21, 1996, Kevin Simmons was shown the book, and also identified Johnson as one of the perpetrators.
Det. Gurtner applied for and obtained arrest warrants for Johnson, Vasquez and Codrington. On November 12, 1995, Det. Gurtner went to 1304 Angus, the home of Codrington's parents, where they believed defendant to be residing. When defendant's mother answered the door, she informed them that defendant was on the premises. The detective explained that he did not have a search warrant, but asked whether she would consent to a search of the residence. She gave her consent, and completed a consent to search form.
Det. Gurtner recovered three red bandanas on the premises. They also seized khaki work pants and a khaki shirt that resembled clothing described by witnesses. Det. Gurtner advised Codrington of his rights, and defendant waived his rights. In response to questioning, Codrington stated he had bought a .12 gauge shotgun the day of the murder. He produced a receipt for the gun dated November 11, 1995. Defendant directed officers to 1040 Tallowtree Lane, the apartment of one Roy Kennedy, where the gun was recovered. Lieutenant Buras immediately unloaded the weapon, removing three live rounds. One round was Winchester brand, and the other two were Federal high power number six shot. Det. Gurtner testified that the type of ammunition recovered at the scene was identical to that found in the weapon. Det. Gurtner also found a box of Federal high power number six .12 gauge shotgun shells.
Codrington made a tape recorded statement to Det. Gurtner on November 12.[2] *571 Codrington stated that he is a member of the 5.9 Bloods gang, and that the gang's members hang out in Harvey. He had known the victim for about a year. He bought a shotgun on the day of the murder because he wanted to protect himself against other gang members. He noted that his friend T-Bone (Vasquez) had been shot the previous night, purportedly by a rival gang. Codrington said that he dropped his gun off at Terry's house, then went to a Wal-Mart store and bought a box of .12 gauge number six buck shot. He dropped the bullets off at Terry's house, and went for a ride in a friend's car. He returned home at about 8:50 p.m. to prepare for work. He was later alerted to the fact that he was wanted by police, and he called the sheriff's office to determine whether that was the case.
On November 12, Det. Gurtner was informed that Terry Vasquez was at the Jefferson Parish Correctional Center, and inquiring as to whether he was wanted for Tyrone Shropshire's murder. Det. Gurtner placed Vasquez under arrest that day. He advised defendant of his rights, and Vasquez signed a waiver of rights form and agreed to make a recorded statement.
In response to Det. Gurtner's questions, Vasquez said that he had been shot at 11:30 on the night of November 10. He was taken to Charity Hospital in New Orleans, and was released after seven or eight hours. His aunt picked him up from the hospital and drove him to the home of his uncle, Peter Colon-Vasquez. He slept there until about 5:00 or 6:00 p.m. on November 11. Several relatives spent the evening visiting with him. He stayed up until 9:00 p.m., then went to sleep. He woke up at noon on November 12. Vasquez said he had last seen Codrington at about 8:00 p.m. on November 10. He stated he had not seen Johnson in two or three days. Vasquez admitted to being a member of the 5.9 Bloods, but said Tyrone Shropshire, the victim, was not a member. He said he would not have shot Tyrone Shropshire, as he's known the victim and his family for five years.
On November 13, 1995, Vasquez asked to make another statement. Det. Gurtner again advised Vasquez of his rights, and Vasquez completed another waiver of rights form. Defendant stated that he had received information that two men known to him as Kalie and Jimal were involved in the murder. Both of Vasquez's statements were played for the jury at trial. Det. Gurtner testified that witnesses were shown a photograph containing a picture of Jeremiah Delamore ("Kalie"), but that none of the witnesses identified Delamore as one of the perpetrators.
Edward Johnson saw a newscast in which he was named as a suspect in the Shropshire murder, and turned himself in at the detective bureau on November 14, 1998. Det. Gurtner placed Johnson under arrest, and advised him of his rights. Defendant waived his rights and submitted to a tape recorded interview. He stated that he was at his girlfriend's house from about 10:00 or 11:00 a.m. on November 11, until about noon the following day. During that time, he was not near the area where the murder occurred. He stated that Codrington and Vasquez are members of the 5.9 Bloods, but that he himself is not. Johnson's statement was played for the jury at trial.
Vasquez called his cousin, Ron Stamp, as an alibi witness. Stamp testified that he telephoned Vasquez at the home of Vasquez's uncle between 7:15 and 7:30 on the night of the murder.

EDWARD JOHNSON

ASSIGNMENT OF ERROR NUMBER ONE
Appellant argues that he was not fully notified of the offense charged when the state used a short form indictment charging him with first degree murder, which was subsequently amended orally to second degree murder with no subsection noted, in violation of appellant's right to due process of law as guaranteed by Article 1, § 13 guaranteeing his right to be advised of the nature and cause of the accusation against him; and Article 1, § 16, guaranteeing his right to a fair trial; and by the due process guarantees of Fifth and Fourteenth Amendments to the United States Constitution.
*572 By this assignment, defendant complains that the bill of indictment and the subsequent bill of particulars did not sufficiently inform him under what subsection of the second degree murder statute he was to be prosecuted. Defendant argues that he was prejudiced in that this lack of specificity deprived him of the opportunity to prepare a defense.
On December 14, 1995, the Jefferson Parish Grand Jury returned a true bill of indictment charging defendants Edwin Codrington and Edward Johnson with the first degree murder of Tyrone Shropshire, a violation of LSA-R.S. 14:30. Terry Vasquez was also charged in the indictment. Johnson was arraigned on December 27, 1995, and pled not guilty. Codrington was arraigned on January 18, 1996, and also entered a plea of not guilty. On March 21, 1997, the state amended the bill of information, reducing the charge to second degree murder as to all defendants.
A post-verdict attack on the sufficiency of an indictment does not provide grounds for setting aside a conviction unless the indictment failed to give fair notice of the offense charged, or failed to set forth any identifiable offense. State v. Cavazos, 610 So.2d 127 (La.1992). LSA-C.Cr.P. art. 464 provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
The bill of indictment in this case originally charged first degree murder under R.S. 14:30, without specifically alleging which of the subsections defendants had violated. The bill adequately tracked the short forms provided under LSA-C.Cr.P. art. 465. If Johnson wished further details regarding the alleged method by which the offense was committed, he was entitled to seek them by way of a motion for bill of particulars. LSA-C.Cr.P. art. 484; State v. Russell, 292 So.2d 681 (La.1974); State v. Larsen, 489 So.2d 324 (La.App. 4 Cir.1986). Johnson did not file a motion for bill of particulars. However, Codrington did file a motion for bill of particulars on February 1, 1996, and included the following question:
If this prosecution is based upon any statute or statutes consisting of sections, parts, paragraphs, or divisions of any kind, specify which section, part, etc. this prosecution is based upon.
On April 8, 1996, Codrington filed a second motion for bill of particulars, asking: "As this prosecution is based on L.R.S. 14:30, first degree murder, and as this statute has seven subsections, specify which subsection this prosecution is based upon?" Defendant further stated: "If this prosecution is based on LRS 14:30(1), specify the underlying felony this prosecution is based upon." On May 30, 1996, the state responded to the second motion for bill of particulars by noting that LSA-R.S. 14:30 A(1), first degree felony murder, was the subsection charged, and that the underlying felony alleged was aggravated burglary.
The state amended the bill of indictment on March 21, 1997, reducing the charge to second degree murder, LSA-R.S. 14:30.1. The amended bill did not specify under which of the subsections of that statute defendants were charged. On September 16, 1997, during voir dire, the state refused to enter into a stipulation offered by Codrington's attorney that robbery or theft played no part in the murder.
Prior to the commencement of testimony the following day, the state agreed not to refer to armed robbery as an underlying offense to the second degree murder, and the prosecutor stated that he would attempt to prove an aggravated burglary as the underlying offense under LSA-R.S. 14:30.1 A(2). There was no objection at that time by any of the defense attorneys. The judge asked whether the prosecutor's disclosure satisfied everyone's concerns in the matter, and the record reflects that all counsel indicated affirmatively.
Johnson contends that what details the state disclosed prior to trial were insufficient *573 to allow him to prepare a proper defense. Moreover, defendant argues, the trial court's refusal to order the state to turn over the supplemental police report prevented him from obtaining much needed information. The trial court inspected the supplemental police report in camera, and ruled that the defense was not entitled to the document, as it contained no Brady material.
The record shows that the state provided defendant with open file discovery, giving him access to the initial police report, photographic lineups, arrest warrants, recorded statements, autopsy reports, and more. Trial counsel informed the court that all discovery had been satisfied. Johnson also benefitted from the information elicited by way of Codrington's motion for bill of particulars.
Although prosecutors maintained they would proceed under the felony murder portion of the statute, the state discussed specific intent to kill or inflict great bodily harm in closing argument. Furthermore, the jury was charged as to both felony murder and specific intent murder. The state, in its brief to this Court, asserts that it pursued a conviction under both theories. It appears that what evidence was produced at trial was made available to defendant during discovery, and that defendant was not surprised at trial.
Considering the foregoing, it appears defendant received fair notice of the charged offense prior to trial.

EDWARD JOHNSON

ASSIGNMENT OF ERROR NUMBER TWO
The state failed to prove that appellant was guilty of second degree murder by a sufficiency of the evidence as required by Article 1, § 2, of the Louisiana Constitution of 1974, guaranteeing due process of law; and the guarantee of due process of law afforded by the Fifth and Fourteenth Amendments to the United States Constitution.
By this assignment, defendant complains that the state failed to provide sufficient proof to support his second degree murder conviction. The standard to be used by the appellate court in evaluating the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La. 1988).
The state avers that it presented its case to the jury under both theories of second degree murder. Defendant argues the state did not prove the requisite elements of either theory. Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1 A(1). The crime is also defined as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of the enumerated felonies (in this case aggravated burglary). LSA-R.S. 14:30.1 A(2)(a). One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. See State v. Dunn, 94-776, p. 9 (La.App. 5 Cir. 2/15/95), 651 So.2d 1378, 1388-1389.
The testimony at trial overwhelmingly indicates that Terry Vasquez was the only one of the three defendants who possessed a gun, and that it was Vasquez who shot Tyrone Shropshire. The state alleged that Johnson was a principal to the murder. LSA-R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Only those persons who knowingly participate in planning or executing a crime are principals to that crime. Mere presence at the scene of a crime is not enough to make one a principal. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, State v. Girod, 94-853 (La.App. 5 Cir. 3/15/95), 653 So.2d 664. Moreover, an individual may only be convicted as a principal for those crimes for which *574 he personally has the requisite mental state. State v. Pierre, supra.
Johnson asserts that the state presented no scientific evidence to link him to the murder. The state produced no fingerprint evidence. Serological tests done on defendants' clothing were negative for blood. Ballistics tests did not tie the gun in evidence to the murder.[3] There was, however, extensive eyewitness testimony placing Johnson at the scene.
Johnson argues that the testimony of the eyewitnesses was conflicting, and that not all of the state's witnesses saw him at the scene. He further notes that the witnesses who identified him were all under the age of twelve at the time of the murder, and that their identifications were therefore unreliable. Encompassed in proving the elements of the offense is the necessity of proving the identity of the defendant as the perpetrator. Employing the Jackson standard, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Rowan, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052; State v. Wheelwright, 615 So.2d 385 (La.App. 5 Cir. 1993), writ denied, 619 So.2d 576 (La.1993).
The identification testimony at trial was sufficient under the Jackson standard. Erica Pierre testified that she and the other children were on the stairs when Johnson and Codrington entered the nearby glass door. Erica and Kevin Simmons were, therefore, in a good position to see defendant before they ran for help. Aaron Pierre Jr. testified that he saw Johnson from his hiding place in a closet under the stairway, and that he saw Johnson and Codrington leaving the house.
Defendant questions how the children were able to make an identification when the perpetrators's faces were covered by masks. Erica Pierre, Aaron Pierre, Jr. and Kevin Simmons were familiar with Johnson before the day of the murder. Kevin testified that Johnson, whom he knew as "Big Ed," used to cut his hair. Erica and Aaron knew Johnson as a member of the 5.9 Bloods, and they testified that the bandanas he and his companions wore were gang emblems. Aaron, Jr. saw Johnson remove his mask before leaving the house. Erica stated she knew Vasquez by his eyes. She further testified that she knew all of the perpetrators by the way they walked, and "everything about them."
In State v. Goodwin, 96-0334 (La.App. 4 Cir. 11/19/97), 703 So.2d 168, writ denied, 97-3159 (La.4/24/98), 717 So.2d 1164, 1998 WL 252321, the court found that the defendant's second degree murder conviction was supported by the witness's identification where she recognized the defendant's features through a ski mask, and where she recognized his voice. In State v. Jones, 96-1581 (La.App. 3 Cir. 6/4/97), 696 So.2d 240, the defendant was convicted of first degree murder after a store clerk identified him as the masked gunman who had robbed a store. The reviewing court found the clerk's testimony sufficient to support the conviction, where the witness said she had spoken to the defendant on several occasions, and she recognized him by his shape, build, walk, and voice.
Erica Pierre and Aaron Pierre, Jr. both identified Johnson from a book of photographs on the night of the murder. Kevin Simmons identified defendant several months later. Det. Gurtner, who conducted the photographic lineups, testified that none of the witnesses identified anyone other than the three defendants. Moreover, Erica, Aaron, and Kevin all identified Johnson in court. Mr. and Mrs. Pierre did not make identifications. It is noted that they did not have a prior acquaintance with Johnson. Lance Washington, who only identified Vasquez, had a different vantage point (the living room) than the did the children, who were on the stairs or in the closet.
As to defendant's assertion that the testimony of prosecution witnesses was inconsistent, it is well settled that where there is conflicting testimony as to factual matters, the question of credibility is within *575 the sound discretion of the trier of fact. The credibility of witnesses may not be re-weighed on appeal. State v. Gaines, 97-672, p. 5 (La.App. 5 Cir. 2/25/98), 707 So.2d 1354, 1358; State v. Jiron, 96-319, p. 3 (La.App. 5 Cir. 10/1/96), 683 So.2d 769, 771.
Johnson contends that the state did not prove he was a principal to the crime under either section of R.S. 14:30.1. He argues that the state did not prove that he had specific intent to kill or inflict great bodily harm. Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the defendant. State v. Silva, 96-459 (La.App. 5 Cir. 11/26/96), 685 So.2d 1119. To support a conviction as a principal to specific intent second degree murder, the state must show that the defendant had the specific intent to kill or inflict great bodily harm. The mental state of one defendant may not be imputed to another defendant. State v. Meyers, 95-750 (La.App. 5 Cir. 11/26/96), 683 So.2d 1378, writ denied, 97-0015 (La.5/9/97), 693 So.2d 766.
In the instant case, there was clearly sufficient evidence to prove that Vasquez had specific intent to kill.[4] Johnson, however, did not supply Vasquez with a weapon, nor did he carry a weapon. Neither Vasquez nor Johnson admitted to police that Johnson participated in or planned the crime. However, Johnson entered the house, during or moments after the shooting, wearing the same type of mask as the gunman (red bandana and hood), and left the house directly thereafter with the gunman. In addition, Johnson followed Vasquez to the second floor where the shooting took place, and participated in the struggle between Vasquez and Mr. Pierre.
Support for the jury's verdict in this case can be found in this Court's ruling in State v. Meyers, supra. In that case this Court found that the driver and a passenger of a car involved in a drive-by shooting possessed the specific intent to support their convictions as principals to second degree murder. Neither Meyers (the driver) nor Davis (a passenger) possessed a weapon, and the fatal shot was fired by their companion, Delmar. This Court reasoned:
In the present case, neither Meyers nor Davis tried to assist the victim, George, after the shooting. They did not call the police to report the shooting or give any statement regarding the murder to anyone. Meyers drove the Cutlass to the scene and Davis watched the incident thru (sic) the car window. Although there was no direct evidence presented that either Meyers or Davis knew Delmar was armed, it can easily be assumed that the jury believed that all three knew exactly what their purpose was in confronting George on the street that night. This was a drive-by shooting quite common in the lives of drug dealers and the participants here all knew that Delmar intended to shoot Samuel George. They were definitely not an innocent driver and passenger in the car.
95-750 at p. 6, 683 So.2d at 1384.
In the instant case, Johnson and Codrington, like Vasquez, masked their faces, indicating they did not want to be recognized. It is also possible to infer, based on the defendants' mode of disguise, that they went to the house together, having planned to commit some bad act. Johnson was in Vasquez's company; it can reasonably be inferred that he knew Vasquez had a gun. Johnson and Codrington failed to assist the victim after the shooting. In fact, they attacked the victim's father, who was trying to restrain Vasquez. Johnson and Codrington also failed to notify police of the shooting. Both Johnson and Codrington clearly played an active role in the commission of the murder.
Under the theory of felony murder, the state was not required to prove specific intent to kill or inflict great bodily harm, but it still had to prove Johnson possessed the *576 mental state to be a principal to murder. Defendant contends the state failed to make such a showing. In State v. Anderson, 97-1301, p. 2, 707 So.2d at 1225, the Louisiana Supreme Court addressed the issue of principals. Quoting 2 W. LaFave, A. Scott, Substantive Criminal Law, § 6.7, p. 138 (West 1996), the court commented, "It is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." It can be reasonably inferred from the evidence that Johnson and Codrington were at the scene ready to provide assistance to Vasquez, and they knew he had a gun.
Johnson contends the state failed to prove aggravated burglary, the alleged underlying offense to felony murder. To prove aggravated burglary here, the prosecution was required to show that defendants, without authority, entered the Pierres' dwelling with the specific intent to commit a felony or theft therein, and that they were armed or committed a battery while inside or upon entering or leaving the house. LSA-R.S. 14:60.
Eyewitness testimony shows that defendants entered the Pierres' house without authority. Although he was himself unarmed, Johnson accompanied Vasquez, who did have a gun. It can also be inferred from the testimony of Mr. and Mrs. Pierre that Johnson committed a battery on Mr. Pierre. The couple testified that after the gunman shot Tyrone, Mr. Pierre struggled with him, and then was attacked by the other men who came upstairs. Mr. Pierre was injured in the attack, and a photograph of his wounds was admitted at trial. The Pierres did not recognize the attackers, but Erica Pierre and Aaron Pierre, Jr. saw no one but Codrington and Johnson go upstairs after the gun was fired.
There was little evidence to support specific intent to commit a theft. None of the defendants admitted to involvement in the crime in their statements to police, and there was nothing taken from the house. As to Johnson's specific intent to commit some other felony, there is some evidence. It might be inferred from Mrs. Pierre's testimony that there was an attempted armed robbery. She stated that the gunman ordered her to "give it up." Ms. Pierre testified that she had money in the house from recently cashed government checks. However, she further testified that she did not know what the gunman meant when he said "give it up."
As between the two theories of second degree murder advanced by the state, there is enough evidence to conclude that the killing was a gang-style execution, and that each defendant had an assigned role, that Johnson knowingly accompanied Vasquez to the victim's house with the intention of killing him. This assignment of error has no merit.

EDWARD JOHNSON

ASSIGNMENT OF ERROR NUMBER THREE
The trial court erred when it determined that Kevin Simmons, a minor, was competent to testify, in violation of Article 1, § 2 of the Louisiana Constitution of 1974, which guarantees due process of law; Article 1, § 16 which guarantees the applicant the right to a fair trial; and the Sixth Amendment to the United States Constitution, guaranteeing the right to cross-examine one's accusers, and the Fifth and Fourteenth Amendments to the United States Constitution, guaranteeing appellant's right to due process of law.
By this assignment, Johnson argues that the trial court erred in finding seven-year-old Kevin Simmons competent to testify at trial. It is first noted that Johnson did not preserve his right to appeal this issue. Only Vasquez's attorney objected at trial to Simmons' testimony. LSA-C.Cr.P. art. 842 provides: "If an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants." Under the article Vasquez's objection can be imputed to Johnson. It is noted, however, that Vasquez's attorney objected to Kevin's testimony on grounds that he was a "surprise" witness. There was no objection made as to the child's competency. Because this issue was not preserved for appeal, it is not properly before this Court. However, in an abundance of caution, the *577 merits of defendant's argument are discussed.
LSA-C.E. art. 601 provides: "Every person of proper understanding is competent to be a witness except as otherwise provided by legislation." Understanding, not age, is the test of whether any person shall be sworn as a witness. State v. Linson, 94-0061 (La.App. 1 Cir. 4/7/95), 654 So.2d 440, writ denied, 95-1120 (9/22/95), 660 So.2d 470; State v. Troulliet, 94-183 (La. App. 5 Cir. 9/14/94), 643 So.2d 1267. A key determination to be made is whether the witness is able to understand the difference between truth and falsehoods. State v. Troulliet, supra; State v. Doss, 522 So.2d 1274 (La.App. 5 Cir.1988), writ denied, 530 So.2d 563 (La.1988). Determination that a child is competent to testify as a witness is based not only on the child's answers to questions testing his understanding, but also in the child's overall demeanor. State v. Bennett, 591 So.2d 1193 (La.App. 1 Cir.1991), writ denied, 594 So.2d 1315 (1992).
The trial court is vested with wide discretion in determining the competency of child witnesses. Its ruling as to competency is entitled to great weight on appeal, and will not be disturbed absent manifest abuse of discretion. State v. Foy, 439 So.2d 433 (La. 1983); State v. Troulliet, supra.
Before allowing Kevin Simmons to testify, the trial judge questioned the child out of the jury's presence. Kevin was able to tell the judge his birth date and year. When asked what it means to tell the truth, Kevin responded, "Don't story." The judge asked him whether he would be able to tell the truth to the jury, and he said that he would. When the judge asked, "What is it when you are doing something wrong?" Kevin responded, "God will punish you." Kevin's testimony before the jury was coherent, and his answers were responsive to the questions asked. He testified that he understood the difference between right and wrong., and between telling the truth and telling a lie.
Defendant contends that Kevin's testimony was unreliable, as it conflicted on some points with the testimony of other witnesses. As noted under Assignment of Error Number One, witness credibility is a question for the trier of fact, and evidence cannot be re-weighed on appeal. Therefore, we find that the trial court did not abuse its discretion in allowing Kevin to testify. This assignment of error has no merit.

EDWARD JOHNSON

ASSIGNMENT OF ERROR NUMBER FOUR
The trial court erred in failing to grant a severance of the defendants, in violation of appellant's rights as guaranteed by Article 1, § 2, of the Louisiana Constitution of 1974, guaranteeing due process of law; Article 1, § 13, enumerating the rights of the accused; and the due process considerations offered by the Fifth and Fourteenth Amendments to the United States Constitution.
Defendant here complains that he was prejudiced by the trial court's failure to sever his case from his co-defendants' for trial. LSA-C.Cr.P. art. 704 provides:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
The defendant is not entitled to a severance as a matter of right, but the decision is within the sound discretion of the trial court, based upon the facts of the case. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Foret, 96-281 (La.App. 5 Cir. 11/14/96), 685 So.2d 210. A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to place the blame on the other, causing each defendant to defend against both his co-defendant and the state. State v. Foret, supra; State v. Myers, 584 So.2d 242 (La.App. 5 Cir.1991), writ denied, 588 So.2d 105 (La.1991), cert. denied, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992). However, reversal of a conviction for failure to sever where antagonism is shown is not always mandated unless prejudice can be shown. Id. Antagonistic defenses are not the only instances where the *578 denial of a motion to sever will constitute an abuse of discretion. Where the ends of justice will be best served by severance, it should be granted. State v. Webb, 424 So.2d 233 (La.1982).
Johnson's counsel filed an oral motion to sever parties on October 10, 1996. Codrington's attorney joined in the oral motion. On October 24, 1996, Johnson re-urged his oral motion to sever, and Codrington again joined in the motion, arguing antagonistic defenses. The trial court took the matter under advisement to allow the parties to file briefs. While Johnson did not file a written motion, Codrington did file a written motion to sever parties on October 28, 1996. Codrington contended that a severance was necessary in that the evidence adduced at pre-trial hearings showed that he was not as culpable as co-defendant Vasquez, and that their defenses were therefore antagonistic.[5] There is no evidence in the record that the trial judge ever ruled on the motion to sever. At the start of trial, the defense and prosecution agreed that all motions had been satisfied. It is assumed, since defendants were ultimately tried together, that the trial court denied the motion.
Where a severance motion is made before trial, the reviewing court need not consider whether the evidence was so overwhelming that the defendant would have been convicted anyway had there been separate trials. It is incumbent upon the reviewing court to examine the propriety of the trial court's ruling irrespective of whether the defendant's conviction would have been certain at a separate trial. State v. Webb, supra.
In the instant case, the trial court did not abuse its wide discretion in denying the motion to sever. It is first noted that the defendants' defenses were not antagonistic. None of them admitted in their statements to the police to any involvement in the Shropshire murder, nor did any one defendant attempt to implicate the others. Vasquez offered an alibi defense, but it did not conflict with the defenses of his two co-defendants.
The thrust of Johnson's argument below and on appeal is that he was not as culpable in the murder as Vasquez, and that by trying him with Vasquez, the state invited jurors to impute an unfair amount of blame to him. In State v. Foret, 685 So.2d at 224, this Court found that "[j]ustice does not require severance where only the extent of participation of each defendant is at issue." Johnson's alleged role in the murder in relation to Vasquez's was therefore not a consideration for the trial court in determining whether a severance was required.
Defendant complains that evidence of his co-defendants' gang affiliations reflected adversely on him, and that he was thereby prejudiced. It was revealed during the pre-trial proceedings, however, that witnesses had identified Johnson as a gang member, independent of his involvement with Vasquez. Erica and Aaron Pierre, Jr. and Kevin Simmons all described Johnson as having worn a red bandana, a symbol of the Bloods gang. This assignment of error has no merit.

EDWARD JOHNSON

ASSIGNMENT OF ERROR NUMBER FIVE
The trial court erred in denying the defense's request to sequester witnesses at the motion hearing held on October 10, 1996, resulting in prejudice to appellant, in violation of his right to due process of law as guaranteed by Article 1, § 2 of the Louisiana Constitution of 1974; his right to a fair trial as guaranteed by Article 1, § 16 of the Louisiana Constitution of 1974; and the due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution.
By this assignment, defendant complains he was prejudiced by the trial court's refusal to order sequestration of witnesses during a motion hearing on October 10, 1996. LSA-C.Cr.P. art. 764 provides: "The exclusion of witnesses is governed by Louisiana Code of Evidence Article 615. That article provides, in pertinent part:

*579 A. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.
The purpose of the sequestration rule is to prevent witnesses from being influenced by the testimony of earlier witnesses and to strengthen the role of cross-examination in developing the facts. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); State v. Sterling, 95-673 (La.App. 5 Cir. 2/27/96), 670 So.2d 1316.
LSA-C.E. art. 615A tracks the former language of article 764 of the Louisiana Code of Criminal Procedure, which governed sequestration prior to a 1989 amendment. The old article[6] was interpreted to mean that the trial court has no discretion when an order of sequestration is requested either by the state or the defendant. The issuance of the order is mandatory, subject to the trial court's power to modify the order thereafter in the interest of justice. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Arnold, 466 So.2d 520 (La.App. 3 Cir.1985), writ denied, 470 So.2d 124 (La.1985).
The trial court's failure to order sequestration is subject to harmless error review. In State v. Johnson, 438 So.2d at 1096, the Louisiana Supreme Court stated:
Where the purpose of sequestration is not thwarted by the presence of witnesses ... and where defendant cannot be shown to have been materially prejudiced thereby, the refusal of the trial court to order sequestration may be considered harmless error.
See also, State v. Brown, 552 So.2d 612, 614 (La.App. 2 Cir.1989), writ denied, 558 So.2d 581 (La.1990).
More recent jurisprudence provides that the resolution of sequestration problems is within the sound discretion of the trial court. On appeal, the reviewing court will look at the facts of each case to determine whether a sequestration violation resulted in prejudice to the accused. See State v. Lutcher, 96-2378, p. 9 (La.App. 1 Cir. 9/19/97), 700 So.2d 961, 971, writ denied, 97-2537 (La.2/6/98), 709 So.2d 731.
At the motion hearing at issue, the state called only Det. Gurtner as a witness. Codrington's attorney requested sequestration of any additional state witnesses, noting that he had no knowledge of whom the potential witnesses in the case were. Johnson joined in the request, arguing that any witnesses listening to the hearing testimony would be able to gather information that would later influence their own testimony. The trial judge denied the sequestration, reasoning that, "To me, the State and the Defense are free to talk to any and all witnesses or potential witnesses and tell those witnesses what they know."
Defendant now argues that the state's trial witnesses could have been in the courtroom during the motion hearing, listening to evidence that might have influenced their testimony at trial. There is no evidence in the motion hearing transcript as to what witnesses, if any, were in the courtroom during Det. Gurtner's testimony. The judge stated it was his understanding that the state had no potential witnesses in the courtroom.
Defendant seems particularly concerned that Kevin Simmons might have been at the hearing, and that he might have been influenced by Gurtner's testimony. Kevin made a photographic identification of Johnson on June 21, 1996, well before the motion hearing. Defendant hints at the possibility of collusion among the state's witnesses, but does not offer specific instances of such activity. If, as defendant asserts, the state's witnesses gave conflicting testimony, this would seem to signify that they were not collusive. Defendant fails to show that he was materially prejudiced by the trial court's refusal to order sequestration. This assignment of error has no merit.

*580 EDWIN CODRINGTON

ASSIGNMENT OF ERROR NUMBER ONE
The evidence was insufficient to sustain the verdict in that it failed to negate the possibility of misidentification by credible evidence, failed to establish that the appellant as a principal, had the specific intent to kill, failed to establish the elements of the underlying offense of aggravated burglary, and failed to establish the appellant was a principal to the crime.
By this assignment, defendant complains that state failed to sufficiently prove the elements of second degree felony murder. Jackson v. Virginia, supra. Codrington first asserts there was a reasonable possibility of misidentification. Defendant was identified only by Aaron Pierre, Jr. and Erica Pierre. He contends that Erica Pierre, who was eleven years old at the time of the murder, did not make a credible identification. He asserts she was influenced by her brother, Aaron, Jr., who told her he knew who had committed the murder. However, when defense counsel suggested to her on cross-examination that she did not know who the perpetrator was until her brother told her, Erica responded, "I know who it was." (Id.). She stated that all Aaron told her was that he knew who committed the crime; he did not tell her who it was.
Codrington notes that Erica did not name him in her first two statements to police. He further notes that her statement indicates she first told police that only two men entered the house, but later identified three. At trial, Erica testified that she is now positive there were three men, and that she was still frightened and in shock over her brother's death when she spoke to officers. However, she testified that she remembered telling the police that there were three men. Defendant asserts that, based on Lance Washington's testimony, Erica may have left the house before the second and third perpetrators entered. Washington testified that he saw only Vasquez enter the house, and that he and the children ran out through the front door after the shot was fired. The children were in a position to see more than Washington did. They were on the stairway near the back door, whereas Washington was in the living room, closer to the front door.
Codrington further contends that Aaron Pierre, Jr.'s identification was unreliable. He argues that Aaron did not have a clear view of the perpetrators, and that the young man was able to describe him to police only by the nickname "Bolo." Defendant speculates that Aaron, Jr. was influenced in his identification by bystanders at the scene. This is, however, not supported by the record.
Aaron, Jr. testified that he was in the living room playing cards when Vasquez entered the house. His chair was facing the back of the house, and he could see the sliding glass door in the kitchen from where he was sitting. He further testified that Codrington (a/k/a "Bolo") entered through the glass door, followed by Johnson. He heard a gunshot, then heard someone coming down the steps. He hid inside a closet under the stairway. He opened the door a crack, which allowed him to see the back door. He saw three people descend the stairs and exit through the door. Codrington did not remove his mask, but Aaron, Jr. saw the other two men remove theirs.
The jury found the Pierre children's testimony credible, despite some inconsistencies. The jury's credibility determination is not clearly contrary to the evidence, and therefore will not be reversed on appeal. See State v. Goodwin, 96-0334, p. 5, 703 So.2d at 172. Based on the foregoing, as well as the discussion above under Johnson's Assignment of Error Number Two, the state sufficiently proved identification.
Codrington claims the state failed to prove he was a principal to the murder. He argues that the state did not prove he had specific intent to kill or to inflict great bodily harm, or that he had the requisite mental state to be a principal to felony murder.
The analysis applied above in the discussion under Johnson's Assignment of Error Number Two is pertinent to Codrington's argument. In addition, Codrington's purchase of the gun used in the murder is key evidence of his mental state. Codrington *581 admitted to police that he had bought the .12 gauge shotgun and two types of ammunition on the day of the murder. He produced a receipt, and led officers to the weapon. Defendant said in his recorded statement that he had left the gun and ammunition with Terry Vasquez. The shotgun was identified by witnesses as the gun Vasquez brought into the Pierre's house. Firearms expert Louise Walzer was unable to determine whether the bullets from the scene and from the victim's body were fired by this gun, but she did state that the bullets were consistent with .12 gauge shot. A live round retrieved from the murder scene was the same type as was found in the gun subsequent to its seizure at Codrington's mother's apartment.
Given that Codrington gave Vasquez the gun, was disguised in the same manner as Vasquez, and entered the house shortly after Vasquez did, it is possible to infer that Codrington accompanied Vasquez to the scene, and that he knew Vasquez was armed. It is also possible to infer, from Codrington's actions, that he was aware of Vasquez's intention to shoot Shropshire.
Given Codrington's admitted involvement with the murder weapon, the evidence of his specific intent to kill or inflict great bodily harm is strong. The gun also makes it possible to impute to Codrington the mental state required as to felony murder.
As discussed infra, the proof is greater as to specific intent murder than as to felony murder. This is even more so in Codrington's case than in Johnson's, given that Codrington supplied Vasquez with the gun.

EDWIN CODRINGTON

ASSIGNMENT OF ERROR NUMBER TWO
The appellant argues he was never "informed" as to the true nature of the charges against him despite a bill if [sic] particulars and open file discovery.
Codrington adopts, by reference, Johnson's argument on this issue. See discussion under Johnson's Assignment of Error Number One. We find no merit in this argument.

EDWIN CODRINGTON

ASSIGNMENT OF ERROR NUMBER THREE
Codrington adopts, by reference, Johnson's argument that the three defendants should have been severed. See discussion under Johnson's Assignment of Error Number Four. Likewise, we find no merit in this argument.

EDWIN CODRINGTON

ASSIGNMENT OF ERROR NUMBER FOUR
The jury charge was defective as to the law of principals and as to the definition of the underlying offense of aggravated burglary.
By this assignment, defendant complains that the trial court failed to properly instruct the jury that specific intent was required of each defendant in specific intent murder, and also as to aggravated burglary. Defendant further contends that the trial judge failed to charge the jury as to all of the elements of aggravated burglary, the alleged underlying offense to the second degree murder.
Defendant concedes that neither he nor his co-defendants made a timely objection to the jury charge. In general, a defendant's failure to raise a contemporaneous objection to an allegedly erroneous jury charge precludes appellate review of the alleged error. State v. Hubbard, 97-916 (La. App. 5 Cir. 1/27/98), 708 So.2d 1099, State v. Jackson, 96-661 (La.App. 5 Cir. 4/9/97), 694 So.2d 440, writ denied, 97-1255 (La.10/13/97), 703 So.2d 612. In State v. Meyers, 95-750 at p. 10, 683 So.2d at 1388, the defendant argued that the trial court failed to properly instruct the jury that specific intent must be proven as to each defendant. This Court found the defendant was not entitled to appellate review, as there was no contemporaneous objection to the jury charge.
In State v. Hubbard, 97-916 at p. 7, 708 So.2d at 1107, this Court stipulated that a jury instruction to which there was no contemporaneous objection may be reviewed when: "(1) the error violates fundamental requirements of due process; and (2) the trial record is sufficient to establish the error *582 without the need for a post-trial evidentiary hearing." See also State v. Page, 96-227 (La.App. 5 Cir. 8/28/96), 680 So.2d 104, writ denied, 96-2543 (La.9/19/97), 701 So.2d 153 (in which this Court considered a challenge to a jury charge on the intent element of burglary despite the lack of a contemporaneous objection, where the defendant claimed the charge violated his due process rights).
In State v. West, 568 So.2d 1019, 1023 (La.1990), the Louisiana Supreme Court set forth the standard for evaluating jury instructions:
The test articulated is whether, taking the instruction as a whole, reasonable persons of ordinary intelligence would understand the charge.
In instructing the jury as to the law of principals, the trial court read LSA-R.S. 14:24, the statute which defines principals. Defendant complains, however, that the judge failed to instruct the jurors that each defendant individually must have the requisite intent to commit a specific intent murder or to commit an aggravated burglary, the alleged underlying offense to felony murder. Considering the challenged charges in the context of the whole jury charge, however, it does not appear that the jury applied the charge in an unconstitutional manner.
The judge instructed the jury as to the elements of both specific intent murder and felony murder. The judge then instructed the jurors that:
specific criminal intent is that state of mind which exits (sic) when the circumstances indicate that the offender or offenders actively desired the prescribed criminal consequences of his act or failure to act.
Thus, in order to convict each defendant of second degree murder, you must find that the defendant or defendants killed Tyrone Shropshire, and that the defendant or defendants acted with a specific intent to kill or inflict great bodily harm.
(Emphasis added.)
Defendant argues that the instructions in this case are comparable to the ones found insufficient by the court in State v. West, supra. In that case, the defendant was convicted as a principal to first degree murder. The trial court instructed the jury as to specific intent in the context of the first degree murder statute. As to the law of principals, the court instructed the jury that "all persons knowing the unlawful intent of the person committing the crime ... are principals and are equal offenders and are subject to the same punishment." Id. at 1024.
The West court found that the trial court's charge "could have led a reasonable person of ordinary intelligence to believe he could imply specific intent from the mere fact defendant knew of his co-perpetrators' intent. Such an interpretation would relieve the state of its burden of proof on the critical question of state of mind." Id. The key concern of the West court was that the jury understand that it must find specific intent as to each defendant, and a defendant's intent may not be inferred simply because an accomplice had the requisite mental state. See also, Flowers v. Blackburn, 779 F.2d 1115 (5th Cir.1986), cert. denied, Blackburn v. Flowers, 475 U.S. 1132, 106 S.Ct. 1661, 90 L.Ed.2d 204 (1986). The charge in this case can be distinguished from the one in West. By informing the jurors that they could find specific intent on the part of one defendant or all defendants, the trial judge adequately communicated the law to the jury.
In State v. Smith, 96-261 (La.App. 3 Cir. 12/30/96), 687 So.2d 529, writ denied, 97-0314 (La.6/30/97), 696 So.2d 1004, where the defendant was convicted as a principal to first degree murder, the court approved an instruction even less explicit than the one in the instant case. The trial court in that case tracked LSA-R.S. 14:24 in instructing the jury on the law of principals. The trial judge also instructed the jury:
Thus, in order to convict the defendant of first degree murder, you must find beyond a reasonable doubt that he had an intent to kill or inflict great bodily harm, and he offered or gave anything of value for the commission of the crime.
96-261 at 51, 687 So.2d at 561. The Smith court found the charge sufficient in that it informed the jurors that they must find that *583 "he," the defendant, had specific intent to kill in order to find him guilty of murder.
Defendant further complains that the trial judge failed to properly charge the jury as to the elements of aggravated burglary, as he did not instruct the jury that aggravated burglary is a specific intent crime. When taken in the context of the whole jury charge, the trial court's charge as to aggravated burglary was sufficient. The judge tracked the language of the statute, stating that the crime includes "the intent to commit a felony or any theft ..." As discussed above, the court also instructed the jury as to specific criminal intent.
This Court approved a comparable jury charge in State v. Page, supra. The defendant in that case challenged the trial court's simple burglary instruction, arguing that the judge had misled jurors by instructing them as to both general and specific criminal intent, whereas burglary is a specific intent crime. This Court acknowledged that the instruction as to general intent was erroneous, but found the instruction as a whole was not prejudicial, as the trial court had properly instructed the jury that an essential element of the crime was "the intent to commit a felony or theft ..." 96-227 at p. 4, 680 So.2d at 107.
Defendant complains that he was prejudiced by the trial court's failure to define theft or any other felony needed to support aggravated burglary. The trial court tracked the elements of aggravated burglary as found in LSA-R.S. 14:60. When viewed in the context of the jury charge as a whole, it appears the instruction was sufficient for the jury to understand. This assignment of error has no merit.

EDWIN CODRINGTON

ASSIGNMENT OF ERROR NUMBER FIVE

ERRORS PATENT REVIEW
The record was reviewed for errors patent as to both Codrington and Johnson. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990); State v. Godejohn, 425 So.2d 750 (La.1983).
The trial court did not inform either Johnson or Codrington of the three-year delay of filing an application for post conviction relief, as provided in LSA-C.Cr.P. art. 930.8. Accordingly, we remedy this error by ordering the trial court to send written notice to defendant of the prescriptive period within ten days of the rendering of this Court's opinion, and to file written proof in the record that defendant received such notice. See State v. Kershaw, 94-141 (La.App. 5 Cir. 9/14/94), 643 So.2d 1289; State v. Procell, 626 So.2d 954 (La.App. 3 Cir.1993); State v. Sumlin, 605 So.2d 608 (La.App. 2 Cir.1992).
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] Defendant is referred to as both Cedrington and Codrington in the record. The confusion appears to have originated with a typographical error in the booking procedure. Prior to trial, the parties entered into a stipulation that defendant's true name is Codrington.
[2] By agreement of counsel, all hearsay and references to his co-defendants' gang affiliations were excised before Codrington's statement was played for jurors.
[3] Louise Walzer, an expert in firearms identification, testified that projectile removed from the victim's body was consistent with a .12 gauge, but tests were inconclusive as to whether the spent shell found near the victim at the scene was fired from State's Exhibit One.
[4] For purposes of second degree murder, specific intent may be inferred from the pointing of a gun at close range and pulling the trigger. State v. Seals, 95-0305 (La.App. 5 Cir. 11/25/96), 684 So.2d 368, rehearing denied, (12/13/96), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Thorne, 93-859 (La.App. 5 Cir. 2/23/94), 633 So.2d 773.
[5] Under LSA-C.Cr.P. art. 842, a pre-trial motion for a severance is presumed to have been made on behalf of all defendants unless the contrary appears true. See State v. Parker, 506 So.2d 675 (La.App. 5 Cir.1987), writ denied, State v. Tell, 512 So.2d.456 (La.1987).
[6] The old language of article 764 is embodied in LSA-C.E. art. 615.